Shiloh Construction Company, Inc., appeals from orders of the trial court dismissing its claim based upon breach of contract and requiring remittitur as a condition to the overruling of the motion for new trial of Mercury Construction Corporation; and from that order which set aside the jury verdict and judgment based thereon and granted Mercury's motion for new trial.
Mercury cross-appeals, contending the trial court erred by allowing Shiloh to proceed to trial on its claim based upon fraud.
Shiloh is a Texas corporation, the principal business of which is concrete construction. It is owned and operated by Wendell Halpin and Thomas H. Vanderventer.
Mercury Construction Corporation is a general contractor. It was awarded a contract with the United States Army Corps of Engineers for construction of two trainee barracks on the military reservation at Fort McClellan, Alabama. The Corps of Engineers issued plans, specifications, and amendments thereto, to prospective bidders. Mercury estimated prices for the work and obtained quotations from certain subcontractors in order for them to bid on subcontract work.
Shiloh's first contact with Mercury was after Mercury had been awarded the Fort McClellan construction contract. A few days after 4 July 1976 Mr. Halpin of Shiloh contacted Mercury's senior estimator, Mr. Charles Jones, in Montgomery, expressed an interest in submitting a bid for the concrete subcontract on the Fort McClellan barracks, and made an appointment to pick up a copy *Page 811 
of the plans and specifications two days later.
When Halpin picked up the plans and specifications at Jones's office he was given a set that did not contain certain amendments thereto which had previously been made by the Corps of Engineers. Jones, at that time, had in his office at Mercury, for his own use, a set of plans and specificationswhich did contain the amendments. When properly amended and posted, the plans and specifications are conspicuously marked to show that the amendments were included. The set given Halpin for the purpose of Shiloh preparing its bid was not so marked.
Halpin used those unamended plans and specifications to compute Shiloh's original bid of $833,000 for the concrete subcontract of the Fort McClellan project. In August 1976, on the basis of its bid, Shiloh was invited to Mercury's field office at Fort McClellan to negotiate a contract.
At these negotiations, Halpin and Vanderventer represented Shiloh. Mercury was represented by Jones, Bobby Head, its senior construction manager, Charles Jordan, its Fort McClellan project manager, and Joe Potter, an engineer assigned to the field office to assist Jordan.
Although Mercury offered some evidence to the contrary, there was testimony that Shiloh's negotiators brought to the negotiations, and had in plain view of Mercury's negotiators, the unamended plans and specifications supplied them by Mercury. The fact that the plans and specifications there present were not amended was conspicuous from the absence of a stamp on the front of them indicating the amendments had been posted. There was also testimony that one of Shiloh's negotiators questioned whether there were addenda containing amendments to the plans and specifications in Shiloh's possession. Head, of Mercury, responded by stating: "* * * they are darn sure in there."
The evidence shows that during the negotiations Shiloh was promised the job would follow the Critical Path Method and "that everyone would be out of our way, no one would hold us up in any way, we could get our crews out there, a minimum number of people, and do our work and our production orders and there would be no hold up." The Critical Path Method (CPM) of scheduling construction work utilizes a flow chart showing the work to be performed and the sequence in which it is to be performed. It is used to achieve a smooth and continuous flow of work and to assure completion of the project at a designated time.
Shiloh was induced to lower its bid price for capillary fill, a crushed rock subsurface for concrete floors, based on assurances by Mercury's Jordan that the CPM would allow Shiloh to spread the capillary fill by truck before structural steel was erected. In fact, structural steel was allowed to be erected before Shiloh spread the capillary fill and as a result Shiloh was forced to spend additional money on manual labor.
The negotiations were concluded and culminated with an agreement that Shiloh would do the concrete work for the sum of $794,000, whereupon, Shiloh employed John Ingram as job superintendent and directed him to begin hiring men and acquiring equipment. Actual work at the job site commenced some time shortly before 18 August 1976. At this time, Mercury supplied Ingram with full size field plans which included the amendments. About a week and a half later, Halpin, one of Shiloh's principals, questioned Ingram about discrepancies in the work being performed and the specifications set out in the plans and specifications used by Halpin to work up Shiloh's bid. At this time Halpin discovered the plans and specifications supplied Shiloh for construction differed from those supplied Halpin for bidding the job. He discussed this discrepancy with Jordan, who promised that Mercury would pay for any extra work done as a consequence of the differences in plans and specifications. Shiloh stayed on the job and continued its work according to the amended specifications.
During the course of the work, Jordan, as project manager of Mercury, the general contractor, prepared weekly work schedules. *Page 812 
Under these schedules Shiloh was required to make numerous small-volume pours of concrete which were tedious and labor consuming; therefore, costing more per yard of concrete poured than large-volume pours. There was evidence the job was run in an uncoordinated fashion with subcontractors scheduled so that they were in each other's way. Also, men and tools had to be shifted from place to place and caused to perform smaller and more tedious tasks.
On 14 June 1977, Jordan directed a Mercury employee to padlock Shiloh's office trailer located at the job site. Although Mercury claimed Mercury abandoned the job, there was evidence that the only remaining work consisted of large-volume pours and that two weeks before the padlocking Shiloh had contracted with one Ladson Boozer, a local concrete subcontractor, to perform the remaining work under its contract.
We think it significant regarding Mercury's motives and intent to note that several of Shiloh's workers were hired by Mercury after Shiloh was locked out and Mercury contracted with Boozer to do the remaining work at the same price Boozer had agreed upon with Shiloh and after one of Shiloh's crew leaders had been questioned by Mercury about the qualifications of several of the workers a day or two before the trailer waspadlocked. Two of Shiloh's workers testified that Mercury asked them to work for it a week before the lockout.
Ingram, Shiloh's job superintendent, testified he told one of Mercury's supervisors at some time from two days to a week before the trailer was padlocked that Shiloh had subcontracted with Boozer for the remaining concrete work. Ingram was questioned about the contract price with Boozer and when he stated that price Mercury's representative said it was a good one.
After the padlocking, Ingram was in Mercury's project manager's office where he heard Jordan say to someone on the telephone with reference to the Shiloh contract: "I know when to pull a subcontract and make money off of it."
Under the evidence the jury could have found definite calculable losses suffered by Shiloh to be in a dollar amount aggregating $93,855.50.
The record supports the following as a fair summary of Shiloh's specific claims of fraud:
(1) Mercury intentionally furnished Shiloh an incomplete set of plans and specifications knowing they were incomplete and that Shiloh would use those plans and specifications to prepare a bid for the Fort McClellan concrete work that was economically disadvantageous to Shiloh.
(2) In a negotiating session to establish the price at which Shiloh would perform work for Mercury, the latter misrepresented to Shiloh, with intent to deceive it, the following:
(a) That Shiloh would be allowed to place the capillary fill required for the job from dump trucks rather than by hand labor because Mercury would not begin structural steel erection until Shiloh had placed the capillary fill;
(b) That the Critical Path Method would be used on the project and that it would be strictly followed to the letter in order that Shiloh could more quickly perform its work by being ahead of the other subcontractors in point of time of performance;
(c) That Mercury's purpose in making these intentional misrepresentations was to fraudulently induce Shiloh to lower its bid.
(3) That Mercury had no intention of performing the subcontract with Shiloh at the time it entered into it.
The case was submitted to the jury on the question of whether Shiloh had been defrauded by Mercury and whether any such fraud, if found, was malicious, oppressive or gross, thus entitling the jury, in its discretion, to award punitive damages. The jury verdict was in the amount of $559,966.61.
On motion by Mercury for judgment notwithstanding the verdict, or in the alternative for a new trial, the trial court entered the following order: *Page 813 
 "Regardless of the thoughts or opinions of the Judge concerning the truthfulness of witnesses and the reasonableness of their assertions, the jury was entitled to believe that Plaintiffs lost $2.24 a yard on applying capillary fill because they reduced their bid on a false statement that no structural steel would be erected before the capillary fill was completed or that the job plans called for putting in the capillary fill first and that the material could be trucked in and dumped at the point to be applied. 4500 yards at $2.24 a yard gives a loss of $10,080.00.
 "The jury was entitled to believe that obsolete plans were furnished to bid on and that the difference in cost between the correct plans and the obsolete plans was $13,886.00 due to Plaintiff.
 "The jury was entitled to believe that Plaintiff was unduly shifted about the job, but no specific losses or damages were proved.
 "The great weight of the evidence is that no gross or oppressive fraud was perpetrated.
 "The verdict and judgment are hereby set aside and held for naught and a new trial is ordered, UNLESS, within five days Plaintiffs enter a remittitur of all amounts over $26,841.92 and costs, which is the correct amount due as of the date of the judgment.
 "In the event of such remittitur, the Motion for New Trial is denied."
The issues for resolution on this appeal may be readily discerned from a reading of the first two paragraphs of this opinion.
Mercury says the trial court erred in denying its motion to dismiss, motion for summary judgment, motion for directed verdict, and motion for judgment notwithstanding the verdict; all because Shiloh should not have been permitted to maintain its claim for fraud. The trial court had dismissed claims of Shiloh for breach of contract and quasi-contract upon a showing by Mercury that Shiloh was not qualified to do business in this state and those claims were proscribed by the provisions of Art. XII, § 232, Const. of Ala., 1901, and § 10-2-254, Code 1975. Mercury contends that Shiloh's action based upon fraud may not be maintained because it merely seeks to enforce promises or agreements in connection with a void contract that cannot give rise to legal duties the breach of which may be redressed by an action ex delicto. The principal authority cited in support is C C Products, Inc. v. Premier IndustrialCorp., 290 Ala. 179, 275 So.2d 124 (1972). This cannot be contradicted if the foundation premise is that the action complains of nothing more, in fact, than the failure to perform contract obligations. C C Products is not apt here. In that case the nonqualified foreign corporation sued a former employee, alleging conspiracy to procure breaches of noncompetition clauses in its agents' contracts. The gist of this court's holding was that, any way you slice it, the action was ex contractu. Injunctive relief was sought and, significantly, in each paragraph of the prayer for relief it was prayed that respondents be enjoined from doing certain actsin violation of Premier's contracts with its sales agents. Obviously, where there is no contract there is no basis for an action for interference with one. However, a claim for fraud lies independent of the creation of a valid contract.
That being the case, we need not address appellants' contentions urging the contract to be a valid one because entered into on a United States military reservation which is outside the territorial jurisdiction of Alabama; therefore, permitting actions for breach of that contract to be maintained in Alabama courts.
Actions ex delicto by nonqualified foreign corporations are not prohibited in the courts of Alabama and this is an actionex delicto. See Jones v. Americar, Inc., 283 Ala. 638,219 So.2d 893 (1969).
The question remains whether the trial court erred in its order for a new trial based upon its finding of an insufficiency of evidence to show gross or oppressive fraud and Shiloh's consequent failure to remit any amount in excess of $26,841.92. *Page 814 
We have stated that the imposition of punitive damages in cases of fraud and deceit is discretionary with the jury, acting with regard to the enormity of the wrong and the necessity of preventing similar wrongs. Mid-State Homes, Inc.v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975). This is likewise true where the fraud is malicious, oppressive, or gross and representations are made with knowledge of falsity, or so recklessly made as to amount to the same thing, or made with the purpose of injuring the other party. See Spartan Pools v.Royal, 386 So.2d 421 (Ala. 1980); Hall Motor Co. v. Furman,285 Ala. 499, 234 So.2d 37 (1970).
Once an intent to deceive has been established it is difficult to see but that a fraud was committed grossly.Randell v. Banzhoff, 375 So.2d 445 (Ala. 1979); Hall Motor Co.v. Furman, supra. Proof of fraudulent intent at the time the representation is made is required in cases where fraud concerns a promise or representation regarding a future event,Southeastern Properties, Inc. v. Lee, 368 So.2d 288 (Ala. 1979). In such cases, if, from the evidence, the jury finds present-intent fraud regarding the future event to conclude a fraud was committed, the award of punitive damages is properly within the discretion of the jury.
Because punitive damages are left to the discretion of the jury, with no standard set for the admeasurement of them, a remittitur or new trial should not be ordered merely because in the opinion of the court the jury gave too much. Airheart v.Green, 267 Ala. 689, 104 So.2d 687 (1958). Only where the verdict is the result of bias, prejudice, corruption, or other improper motive, is a court authorized to order a remittitur. B M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala. 1979).
We are not unmindful of strong presumption of correctness indulged in favor of the trial court regarding its rulings on the motion for new trial. We are also aware of the rule that, if, after indulging all reasonable presumptions as to the correctness of the ruling granting a new trial, the ruling was erroneous because the evidence plainly and palpably supported the verdict, then, that ruling is due to be set aside. A review of the evidence in this case discloses that it plainly and palpably supports the verdict. See generally, Kennedy v.General Transport Company, Inc., 293 Ala. 455, 304 So.2d 896
(1975). The great weight of it does support the jury's conclusion that Mercury's fraud was intentional, gross, and oppressive; therefore award of punitive damages was not improper.
Further, we find nothing in the record to show that verdict resulted from bias, prejudice, corruption, or other improper motive. Therefore, we are compelled to reverse the trial court's order of a new trial improperly conditioned upon Shiloh's failure to remit a portion of the damages.
The original verdict and judgment based thereon in the amount of $559,966.61 are hereby reinstated by the judgment of this court. The rulings and actions of the trial court are, in all other respects, hereby affirmed.
REVERSED AND RENDERED ON APPEAL; AFFIRMED ON CROSS-APPEAL.
FAULKNER, JONES, SHORES and BEATTY, JJ., concur.
TORBERT, C.J., and MADDOX, J., dissent.