[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 135 
This is the second time that this case has been appealed to this court. In the first appeal this court reversed and remanded the case to the trial court on the ground that Bowen had not carried the burden of proving bad faith on the part of National Security when it denied his claim for loss of equipment because of fire. National Security Fire CasualtyCo. v. Bowen, 417 So.2d 179 (Ala. 1982). Even though presented, this court did not decide the issues of malicious prosecution and outrageous conduct. Those issues are presented in this appeal.
Following remand to the trial court, the case was tried to a jury on two claims alleged in the complaint. Claim one alleges malicious prosecution. The crux of that claim is:
 "2. Plaintiff claims that defendants, Ed Pierson and Gene Bosche, agents, servants or employees of the defendants, National Security, while acting within the line and scope of their authority for said defendants, maliciously and without probable cause therefor, caused the plaintiff to be indicted on the 17th day of June, 1977, by the Covington County Grand Jury and tried therefor on a charge of (1) false pretenses; and (2) arson."
Claim Two is based on harassment, and is set out below:
 "2. Plaintiff alleges that defendants, Ed Pierson and Gene Bosche, agents, servants or employees of the defendants, National Security, while acting within the scope of their authority for said defendants, (beginning at a time prior to and continuing after said indictment) did intentionally and maliciously harass the plaintiff in the course of an investigation by defendant corporations concerning an insurance claim made by plaintiff against defendant corporations. That defendants, Ed Pierson and Gene Bosche, acting as investigators for said defendant corporations and acting within the scope of their authority as an agent, servant, or employee of said defendant corporations, did bribe witnesses to testify falsely against plaintiff in the judicial proceedings referred to in Claim One in order to coerce plaintiff to drop said claim against defendant corporations; that defendants, Ed Pierson and Gene Bosche, acting within the scope of their authority as agent, servant or employee of said defendant corporations, did attempt to coerce the plaintiff to drop said insurance claim and plead guilty to the criminal charges referred to in Claim One by telling plaintiff they could obtain probation for the plaintiff if plaintiff would plead guilty to the criminal charges.
 "3. Plaintiff alleges that defendants, Ed Pierson and Gene Bosche, acting within the scope of their authority as agents, servants or employees of said defendant corporations, did harass the plaintiff by continually telephoning, at all times of the day, the plaintiff and other members of plaintiff's family and threatening the plaintiff and members of his family in an effort to coerce plaintiff to drop the insurance claim against said defendant corporations; that said abusive telephone calls did cause the plaintiff and his family extreme mental suffering and anguish."
Damages of $1,000,000.00 were alleged in each claim of the complaint. The jury returned a general verdict of $1,500,000.00, in favor of Bowen and against National Security. National Security timely filed a JNOV motion, or in the alternative a motion for new trial. The trial court denied both motions. National Security appealed. Its appeal can be reduced to three issues, namely: (1) sufficiency of the evidence, (2) denial of certain written requested charges, and (3) excessive damages.
In 1976, Stanley Bowen was in the business of logging, pulpwooding, livestock *Page 136 
raising, and operating a service station and store. Bowen's brother, Donald Bowen, was in charge of the pulpwood and logging operation. On September 10, 1976, Bowen bought a used John Deere skidder, and a Windham loader to be used in the logging business. Bowen's security agreement for this equipment was assigned to Commercial Credit Equipment Company, Montgomery, Alabama. This equipment was insured by National Security.
During the Thanksgiving weekend of 1976, the skidder was found in a creek — put there by an unknown person or unknown persons. It suffered water damage, and a claim was filed with National Security's agent, R.D. Johnson of Lomax-Johnson, Dothan, Alabama. After investigation by a local adjuster, the claim was paid.
In April 1977, Bowen's skidder and loader were burned. The loss notice filed by Bowen stated that the equipment had been left "in the woods." The agent, R.D. Johnson, became suspicious. He suspected arson. Bowen was unsure as to the cause of the fire, but he pointed a finger at "Frog" Williamson, who had been fired by Donald Bowen prior to the fire. Williamson had let Stanley know that he was greatly displeased with the dismissal. However, Stanley refused to overrule his brother.
Coincidentally, a week before the fire loss notice, R.D. Johnson received a letter from Beneficial Investigative Services, Conyers, Georgia, introducing itself as an organization offering a unique service to the insurance community. The letter, signed by Eugene Bosché, stated that the firm wanted to tell Johnson of its services, "which you may have a need for at this time." Upon receipt of the letter from Beneficial, Johnson telephoned Gene Bosché, its president, and asked if he could determine the origin of the loss, the cause of the loss, and the party responsible. On May 2, 1977, Johnson wrote Bosché a letter confirming their conversation:
 "RE: Special Investigation Insured: Stanley R. Bowen Reported Fire Loss — Date of Loss: April 12, 1977
"Dear Mr. Bosche:
 "In accordance with our telephone conversation of this date, we are enclosing herewith the information presently contained in our file. As you will see, the information consists only of the loss notice and a file copy of the policy with attachments.
 "It is reported to us that the insured left both of the machines that are insured under this policy in the woods and upon returning the next morning found that both of the machines had burned and would in the insured's opinion, be a total loss. The facts would certainly suggest that these machines were deliberately burned and we would like to investigate the possibility of proving who burned the machines.
 "It is my understanding that your investigator will call me before he leaves the area or concludes his investigation so that we can have an opportunity to discuss his file material and determine if any further investigation is merited.
"Very truly yours,
"R.D. Johnson"
Subsequently, Gene Bosché and Ed Pearson were employed by Johnson to conduct the investigation. They were paid on an hourly basis, and their bill amounted to more than $4,000.00 when it was submitted to Johnson.
The investigation by Bosché and Pearson appears to have been conducted in an unorthodox manner as far as so-called private investigators are concerned. When interrogating persons, they would flash some kind of a badge; they used each other's names; they attempted to bribe or threaten persons whom they interrogated to induce them to implicate Bowen as the arsonist; and on one occasion stuffed $200.00 in a person's (Willie Byrd) shirt pocket with the admonition that he was counted on to help them out. On this occasion, the evidence shows that Johnson was with the investigator (Pearson) when the $200.00 was given to Byrd. About a week later the investigator, *Page 137 
Mr. Pearson, attempted to get Byrd to sign a statement implicating Bowen in the burning. When Byrd refused, Pearson threatened Byrd by telling him that he could have him "locked up."
On another occasion, Pearson and Johnson talked to Dick Gavan at a place called the Fish Bowl. They were in a black sports car. Johnson asked Gavan if he knew Bowen (Johnson had some papers in his hand) and Gavan answered yes. Pearson got out of the car and asked Gavan to "sign some papers" stating that Bowen had hired him to burn the equipment. Pearson offered Gavan money to sign. Gavan refused; Pearson flashed his badge, and Gavan walked away.
Pearson went to the home of James Darrell Williamson one night and told him that he was from National Security and he wanted Williamson to sign a statement implicating Bowen. Pearson showed him a badge and told him that if he did not sign he would lock him up for selling drugs. Later on, Pearson went to the Covington County Jail and asked Ronnie Worrells to get on the stand and "lie against Stanley Bowen." Worrells, who could neither read nor write, signed a statement implicating Bowen.
Next, Pearson, accompanied by a deputy sheriff, went to the home of "Frog" Williamson — a person who could neither read nor write — and obtained a statement that implicated Bowen. Pearson gave "Frog" $100.00 designated as "hush money."
Bowen was subsequently indicted by the grand jury for two separate offenses — arson III, and false pretenses. Pearson and Deputy Sheriff Harrell were the only witnesses who appeared before the grand jury. The indictments were based upon the statements of Worrells and "Frog" Williamson. Bowen's trial on the charge of false pretenses resulted in a mistrial. Both cases were eventually nol-prossed by the district attorney.
Meanwhile, even after the indictments, Bosché and Pearson continued to harass Bowen. They threatened to kill his two small sons; they threatened to cut off the children's arms; they called Bowen and told him that he would look good lying beside his dead brother (who, by the way, had suffered a gunshot wound to his head).
Finally, the last time Bowen saw Pearson was while driving north of Brantley. He was stopped by Pearson and two other men on the highway and forced at gun point to drive out into the woods. Once in the woods, they forced him to lie on the ground and placed a gun to his head and threatened to kill him right there. They would snap the hammer on the gun, and Bowen stated he thought they were going to kill him. This continued for approximately one and one-half hours, after which time they forced Bowen back into his truck and drove him to a country store where Pearson said he had a call to make. While Pearson was making his call, Bowen managed to escape.
Out of this lengthy statement of facts, we first must consider the threshold question: Was there a principal-agent relationship between Bosché and Pearson, and National Security? And, it goes without saying, the related questions are authority, express-implied, and in line and scope of, etc. National Security contends that Bosché and Pearson were independent contractors; that it did not authorize in any manner the beastly conduct of Bosché and Pearson; that National Security did not withhold any social security taxes, did not withhold any federal or state income taxes, and had no control over their actions.
First, it is axiomatic that for an agency relationship to exist, there must be right of control by the principal over the agent. Robinson v. Allstate Ins. Co., 399 So.2d 288 (Ala. 1981); Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala. 1980);Wood Chevrolet Co., Inc. v. Bank of the Southeast,352 So.2d 1350 (Ala. 1977). But, it is not essential that the right of control be exercised so long as that right actually exists.Hodges Company, Inc. v. Albrecht, 288 Ala. 281, 259 So.2d 829
(1972).
Second, agency is determined by the facts, and not by how the parties characterize the relationship. Semo Aviation, Inc. *Page 138 v. Southeastern Airways, 360 So.2d 936 (Ala. 1978).
Third, the existence and scope of a principal-agent relationship is normally a question of fact to be determined by the jury. Oliver v. Taylor, 394 So.2d 945 (Ala. 1981); Cashionv. Ahmadi, 345 So.2d 268 (Ala. 1977). It is quite obvious that the jury believed that a principal-agent relationship existed in this case. And, we agree with the jury.
Unfortunately, we do not have the benefit of testimony from either Bosché or Pearson on the question of their relationship with R.D. Johnson and National Security. Johnson denies any agent or employee relationship with them. Yet, Johnson accompanied Pearson on occasions when a bribe was offered and given to Willie Byrd for a statement which would implicate Bowen, and again when Dick Gavan was offered money by Pearson to sign some statements that Bowen had hired him to burn the equipment. (Of course, Johnson denied every fact concerning any principal-agent relationship between National Security, Bosché, and Pearson.) If Bosché and Pearson were mere independent contractors, it would seem unlikely that Johnson would become involved with any part of the investigation by traveling with the investigators. Moreover, Bosché and Pearson called on Johnson at his office at least twice during the investigation. (The investigation lasted approximately two weeks.) Finally, Johnson's letter to Bosché suggests that Johnson would have the final authority as to the completion of the investigation. He wrote Bosché that before the investigation was completed he wanted to talk to the investigator to determine if any further investigation was merited.
We conclude by stating that the question of agency in this case was for the jury. The jury found that there was a principal-agent relationship between National Security, Bosché and Pearson. Its finding was strengthened by the judge when he overruled the motions for new trial and JNOV. Having found that an agency relationship existed, the next question for discussion is authority of Bosché and Pearson.
National Security contends Bosché and Pearson conducted the investigation without any knowledge on its part as to what they were doing or how the investigation was conducted. Mr. Johnson denies each and every bit of the testimony presented by Bowen as to his involvement in the investigation. He testified that he was physically unable to participate in the investigation because he was paralyzed from his armpits down; that he must have a wheelchair to move about. This denial, of course, is a direct contradiction of the testimony of two of Bowen's witnesses, who testified that Johnson was with Pearson when he offered them money to give testimony implicating Bowen in the burning of the equipment.
We opine that the preponderance of the evidence shows that Johnson was very much involved with the investigation; that he knew how and to what extent Bosché and Pearson were investigating the loss. The trial judge saw and heard the witnesses; the jury saw and heard the witnesses, and neither judge nor jury believed Mr. Johnson. We are of the opinion that Bosché and Pearson were acting either with actual authority or implied authority when they were conducting their investigation. We do not believe that Johnson can deny that Bosché and Pearson had authority to act as they did, when the evidence shows that he was with one of them on at least two occasions during the investigation.
We now decide whether the evidence is sufficient to support the jury's general verdict returned under the claims of malicious prosecution and outrageous conduct.
This court stated in S.S. Kresge Co. v. Ruby, 348 So.2d 484
(Ala. 1977):
 "To be successful in an action for malicious prosecution the plaintiff must prove the following elements: `. . . (1) a judicial proceeding initiated by the defendant, (2) without probable cause, (3) malice on the part of the defendant, (4) *Page 139 
termination of the judicial proceedings favorable to the plaintiff, and (5) damages."
The evidence shows that the criminal charges against Bowen were initiated by National Security's agents. It was they who obtained false information from Ronnie Worrells and "Frog" Williamson that, along with appearances before the grand jury by Deputy Sheriff Harrell and Pearson, formed the basis of the indictment of Bowen.[1]
Next, was there probable cause? In S.S. Kresge Co., supra at 488, this court stated some general principles of law on this issue:
 "`Probable cause' as the term is employed in actions for malicious prosecution, is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty." Birwood Paper Co. [v. Damsky]
285 Ala. [127] at p. 134, 229 So.2d [514] at p. 521.
 "Consequently, the mere fact that the plaintiff was acquitted of the charge does not prove that there was no probable cause to believe him or her guilty at the time the warrant was issued. Piggly-Wiggly Alabama Co. v. Rickles, 212 Ala. 585, 103 So. 860 (1925); Gulsby v. Louisville N.R.R. Co., 167 Ala. 122, 52 So. 392 (1910). The question in an action for malicious prosecution arising from a criminal charge is whether the defendant, at the time he or she instituted the prosecution, had probable cause to believe that the accused was guilty. Hanchey v. Brunson, 175 Ala. 236, 56 So. 971 (1911); Gulsby; Jordan.
 "Where evidence of the lack of probable cause is presented by plaintiff and the facts of the case are not in dispute, a question of law is presented to be decided by the court. Birwood Paper Co.; King v. Farrell, 55 Ala. App. 147, 314 So.2d 68 (1975). However, where the material facts are disputed, the issue of *Page 140 
probable cause must go to the jury. Key v. Dozier, 252 Ala. 631, 42 So.2d 254 (1949); Gulsby; Alabama Dry Dock Shipbuilding Co."
This court also stated in Union Indemnity Co. v. Webster,218 Ala. 468, 478, 118 So. 794, 803 (1928):
 "In malicious prosecution the general rule is that the finding of an indictment by a grand jury against one charged with crime is prima facie evidence of the existence of probable cause, and that the acquittal of a defendant upon the trial does not tend to show a want of probable cause for believing him guilty of the offense charged when the arrest is made or prosecution initiated. Such differing results are rested upon the fact that an acquittal is based upon any reasonable doubt of the defendant's guilt on all the evidence." (Emphasis in the original.)
However, the finding of an indictment by the grand jury is not within itself a full defense to an action for malicious prosecution. The finding and return of an indictment must not be induced by fraud, subornation, suppression of testimony, or other like misconduct of the party seeking the indictment.Morgan v. Baird, 219 Ala. 225, 121 So. 526 (1929). In the instant case, the indictment was induced by false evidence, and when the district attorney discovered the falsity of the evidence, he nolprossed both cases, even though one of the cases had been tried and had resulted in a mistrial. Using false evidence, or, alternatively, suppressing the true evidence, is sufficient misconduct to bring this case from within the general rule.
We opine that the issue of probable cause was properly submitted to the jury.
Next, malice — inducing an indictment by procuring and giving false evidence before a grand jury shows a malicious motive. Any other motive than a bona fide purpose to bring the accused to punishment as a violator of the criminal law or another purpose associated with such bona fide purpose is malicious. Fowlkes v. Lewis, 10 Ala. App. 543, 65 So. 724
(1914). Malice may also be inferred from the circumstances surrounding and attending the prosecution. The existence of malice being a fact which in the nature of things is incapable of positive, direct proof, it must of necessity be rested on inferences and deductions from facts which can be laid before a jury. Lunsford v. Dietrich, 93 Ala. 565, 9 So. 308 (1890). The issue of malice was correctly submitted to the jury.
Next, damages. We believe that what we said on the question of excessive damages in S.S. Kresge, supra at 489-490, can also be said in this case:
 "In an action such as this where punitive damages are allowed, we cannot find that the verdict is so excessive as to require reversal.
 "`This court has laid down the principle that a verdict will not be disturbed as excessive where the trial court has refused to disturb the amount unless so excessive as to indicate passion, prejudice, corruption or mistake. Montgomery City Lines v. Davis, 261 Ala. 491, 74 So.2d 923. And we have held that the correctness of a jury's verdict is strengthened when the presiding judge refuses to grant a new trial.' South Highlands Infirmary v. Camp, 279 Ala. 1, 7, 180 So.2d 904, 909 (1965).
 Moon v. Nolen, 294 Ala. 454, 318 So.2d 690 (1975); Louisville N.R.R. Co. v. Dollar, 294 Ala. 276, 314 So.2d 867 (1975)."
Additionally, we find from the record that Bowen testified that he lost over $50,000.00 defending himself against the charges. While these damages were proven by estimate, it was for the jury to determine the extent and amount of the damages.American Life Insurance Co. v. Shell, 265 Ala. 306,90 So.2d 719 (1956). *Page 141 
 Outrageous Conduct
This court stated in American Road Service Company v. Inmon,394 So.2d 361 (Ala. 1981), that one who by conduct so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society, intentionally or recklessly causes another person emotional distress so severe that no reasonable person could be expected to endure it is subject to liability for such distress. We opine that the facts are sufficient to meet that standard in this case.
National Security contends that there is no evidence of "severe emotional distress" that was suffered by Bowen. It argues that Bowen said that he went to the scene of the fire, and other places, with Bosché, and because of this he could not have suffered any emotional distress. However, the evidence shows that these visits took place before the conduct complained of occurred.
After a thorough review of the evidence, we opine that the conduct of National Security's agents was so horrible, so atrocious, so barbaric, that the jury could find as a matter of fact that Bowen suffered severe emotional distress; that no civilized person could be expected to endure the acts committed without suffering mental distress.
 Requested Charges
National Security claims error because the trial judge refused the following written requested charges:
 "19. The Court charges you that you cannot return a verdict in favor of the Plaintiff on his claim of outrageous conduct unless you are first reasonably satisfied by the evidence that the Defendant, National Security Insurance Company, either authorized certain individuals to engage in conduct which you find to have been outrageous or ratified such conduct after being advised that it had been committed.
 "20. The Court charges you that the tort of outrageous conduct is based upon intentional acts of the Defendant. In this case you must be reasonably satisfied by the evidence not only that certain persons intentionally engaged in conduct against the Plaintiff which you find to be outrageous as I have defined the term, but you must also be reasonably satisfied by the evidence that the Defendant, National Security Insurance Company, actually and intentionally authorized those persons to commit the conduct you find to have been outrageous or you must be reasonably satisfied by the evidence that the Defendant, National Security Insurance Company, had knowledge that such conduct had been committed and with such knowledge intentionally ratified it, before you would be authorized under the law to return a verdict.
 "21. The Court charges you that you cannot award the plaintiff punitive damages based upon his claim of outrageous conduct unless you are reasonably satisfied by the evidence that the Defendant, National Security Insurance Company, either authorized the conduct or ratified it after having knowledge that such conduct had been committed.
 "22. The Court charges you that even if you should be reasonably satisfied by the evidence that certain individuals engaged in outrageous conduct against the Plaintiff, you would not be authorized under the law to return a verdict in favor of the Plaintiff on his claim of outrageous conduct if you have not been reasonably satisfied by the evidence that such conduct was actually authorized by the Defendant or ratified by the Defendant after the Defendant had knowledge of such conduct."
Rule 51, A.R.C.P., provides that the refusal of a requested written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge. *Page 142 
After a review of the court's oral charge, we opine that the trial judge substantially and fairly charged the jury on the question of agency, the elements of the tort of outrageous conduct, and the question of damages.
 CONCLUSION
This is one of the most bizarre cases to come before this court in a long time. Two juries have heard the evidence, and twice they have awarded the plaintiff damages. The trial judge has twice denied a motion for new trial. This court has said on innumerable occasions that on review of the refusal of a motion for new trial by the trial judge, a very strong presumption of correctness is indulged in favor of the trial court's action.Shiloh Construction Co., Inc. v. Mercury Construction Corp.,392 So.2d 809 (Ala. 1980). "Granting or refusing a motion for new trial rests within the sound discretion of the trial court; exercise of that discretion carries with it a presumption of correctness which will not be disturbed by the Supreme Court unless some legal right was abused and the record plainly and palpably shows that the trial court was in error." Hill v.Cherry, 379 So.2d 590 (Ala. 1980).
The order of the trial court denying the motion for JNOV, or alternatively, for new trial, is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ALMON and ADAMS, JJ., concur.
[1] National Security contended that it had nothing to do with presenting Bowen's case to the grand jury; that the decision was made by District Attorney McGill. McGill on direct examination testified:
 "Q. Now, Frank, who made the decision to present these two cases to the grand jury?
"A. I did.
 "Q. Did anybody else make that decision for you or you make it yourself?
"A. I made it myself.
Yet, on cross-examination McGill testified:
 "Q. Now, you say you based your decision to indict Stanley or to present this to the grand jury, and you named everybody in the sheriff's department except, and you didn't name Ed Pearson. You didn't base your decision on anything that Ed Pearson did?
 "A. I can't remember whether he gave me the report then or he brought the report over when he came to testify, but he likewise had some diagrams and Don had similar and same diagrams, and I imagine I looked at all of them.
 "Q. Well, the reason you got Frog in to take the statement from him was because you had read the statement that Don Harrell read, right?
"A. Yes, sir.
"Q. Do you know who took this statement?
". . . .
 "Q. Well, if Don Harrell said that Ed Pearson took this statement and this was in his handwriting. He didn't tell you that?
 "A. That is not Don Harrell's handwriting. I'd recognize Don Harrell's handwriting.
 "Q. That is what I say, he said that is Ed Pearson's handwriting.
 "A. Whatever Don told me, I imagine he told the truth. If he said he took it, he took it.
 "Q. He didn't tell you about that Ed Pearson took this statement that he showed you?
"A. I am sure he did.
"Q. Alright.
 "A. But, I don't recall him saying, Mac . . . Ed Pearson took this statement.
 "Q. What I am getting at, Mac, you have carefully left Ed Pearson out?
"A. No, sir, I didn't very carefully leave anybody out.
"Q. Well you didn't name him when you said who you based —
 "A. Well I'll name him now. I based it on some of the diagrams and things that he had and showed me.
"Q. Who had?
"A. I assume Ed Pearson had them.
"Q. Alright.
"A. But, Don is the one that showed them to me.
 "Q. Alright, all I want you to do is to include Ed Pearson in it.
"A. Alright, we'll include him."