This appeal arises from a fraud and breach of contract suit filed by Rivers Construction Company, a corporation, and Allen Foster against L.W. Johnson and Associates, Inc. ("Johnson 
Associates"), and L.W. Johnson. Johnson Associates contracted with Rivers Construction for pipeline work in connection with gas wells developed by Johnson Associates. After Rivers Construction completed substantially *Page 619 
all of the work, Johnson Associates refused to pay. The jury awarded $165,000 compensatory and $500,000 punitive damages.
Johnson Associates and Johnson raise the following issues:
 "I. Whether the trial court erred to reversal by failing to grant defendants' motions for mistrial and/or post-trial motion for a new trial, raising as an issue the [alleged] misconduct and improper jury argument of plaintiffs' counsel.
 "II. Whether the trial court erred to reversal by failing to grant defendants' post-trial motion for a new trial raising as an issue the [alleged] excessiveness of the punitive damages awarded by the jury.
 "III. Whether the trial court abused its discretion by failing to grant to defendants a continuance of the trial.
 "IV. Whether the trial court erred to reversal by failing to grant defendants' motion for a directed verdict and/or their post-trial motion for JNOV with respect to the claims of Allen Foster, individually; and by failing to grant defendants' post-trial motion for a new trial with respect to the claims of Rivers Construction Company, raising as an issue the [alleged] confusion caused by the submission of claims by both plaintiffs to the jury."
Defendant L.W. Johnson is the principal shareholder and chairman of the board of defendant L.W. Johnson and Associates, Inc. Plaintiff Allen Foster is the president and sole shareholder of plaintiff Rivers Construction Company, a Mississippi corporation. On or about March 15, 1985, Johnson telephoned Foster to discuss pipeline work for gas wells Johnson Associates was developing in the vicinity of Vina, Alabama. A few days later, Johnson and several employees of Johnson Associates met Foster in Tupelo, Mississippi, and drove to Vina to look at the wells and discuss the work. Johnson wrote a document headed "Check list — Pipeline," dated March 21, 1985, and describing the work to be done.
The parties apparently agreed to enter into a contract for the price of $115,000, although no written contract appears in the record. Johnson testified that that price included a $35,000 bonus because Rivers Construction could begin work immediately and could assist in financing by buying materials on its own credit. Foster testified, on the other hand, that the contract price did not include a bonus, but that Johnson promised a bonus of a 5% interest in a four-well drilling program, known as the Pilot Hill Program No. 5, if Rivers Construction completed the work by April 15.
On March 22, Johnson Associates, by Johnson as its president, executed a mortgage of its interest in the Pilot Hill Program No. 5 to Rivers Construction, "in consideration of the sum of $115,000 hereby acknowledged to have been paid," and as security for a promissory note in that amount from Johnson 
Associates to Rivers Construction on June 22, 1985. Johnson testified that Foster requested this mortgage so that Rivers Construction could use it as security for loans to buy materials. Foster, however, testified that he did not need the mortgage as security to obtain credit, but rather that he requested it as security for payment of Johnson Associates' obligation under the contract. He testified that Johnson represented to him that Johnson Associates held at least a 20% interest in the Pilot Hill Program No. 5.
That representation is a principal basis of the fraud action: Foster testified that he moved his crew to Vina and began work in reliance on Johnson's assurances that the mortgage represented at least a 20% interest in the Pilot Hill Program No. 5. In deposition and at trial, Johnson testified that the mortgage conveyed only a three or four percent interest in the subject property.
Foster testified that, when he expressed concern to Johnson that Rivers Construction was not qualified to do business in Alabama, Johnson reassured him, saying that if any problem arose, Johnson Associates could put Foster on its payroll. *Page 620 
Johnson denied having made any such statement. Foster attempted to have Rivers Construction qualified to do business in Alabama; however, he paid the tax required by Ala. Code 1975, §40-14-1, but did not apply with the secretary of state for a certificate of authority, as required by § 10-2A-226 et seq.[1]
These facts are pertinent to the second aspect of the fraud claim, i.e., that Johnson fraudulently induced Foster to enter into the contract by promising to pay for his work with no intention of doing so. Foster testified that when he asked to be paid, Johnson would not talk to him and that Johnson 
Associates' employees said that he was not being paid because Rivers Construction was not qualified to do business in Alabama.
Under the contracts, Johnson Associates was to provide certain large items of equipment, such as a compressor station, a dehydrator unit, and production units for the wells. None of this equipment was on the site when Foster and his crew arrived. Foster testified that six production units arrived about three weeks later, that the dehydrator arrived some time in April, and that the compressor did not arrive until May. Johnson asked Foster to use a certain supplier for pipe and other materials, and Foster initially did so, but when he experienced delays in receiving materials he began ordering from his usual supplier. Thus, through no fault on its part, Rivers Construction was unable to meet the April 15 deadline.
Johnson Associates had Rivers Construction do additional work while its crew was on the job site, including laying about 7000 feet of pipe. Foster obtained pipe for another additional pipeline, but was ordered off the job site before laying it. Johnson Associates hired another contractor to lay this pipe, even though Foster told the Johnson Associates personnel not to use the pipe. The complaint included a count for conversion of this pipe, but that count was not submitted to the jury.
On May 25, an employee of Johnson Associates wrote and signed the following on a paper and gave it to Foster: "Informed Rivers Construction to stop work on drip legs at 12 noon this date as per instruction of Mr. L.W. Johnson." The pipeline included three "drip legs" that leaked when the line was pressurized. Rivers Construction replaced two of them with straight sections of pipe, and Johnson Associates later had the third one replaced. The evidence tended to show that the replacement of the drip legs was an adequate, if not preferable, substitution. The highest estimate of any loss caused by any failure of Rivers Construction to perform under the contract came from Johnson himself, who testified that these and all other alleged deficiencies in Rivers Construction's performance took $15,000 to $20,000 to correct. Although defendants made some attempt to show that they did not pay Rivers Construction because its work was not suitable, Foster testified that he was never told that his work was unsuitable.
Foster testified that after he was ordered off the work site, he tried to call Johnson at his business office in Mobile, but Johnson would not return his calls. He testified that when he talked to John Causey, vice president of Johnson Associates, Causey told him that he would not be paid "Because I wasn't an Alabama licensed contractor." Causey denied having made that statement.
Foster and Rivers Construction filed this action on July 7, 1985. Through proceedings not necessary to relate here, Rivers Construction foreclosed on the mortgage given by Johnson 
Associates and received $135,250 at the foreclosure sale.[2] *Page 621 
On January 2, 1986, the attorney who had been representing Johnson Associates and L.W. Johnson in this case and in the foreclosure proceedings filed a motion to withdraw, stating that the defendants "have apprised him that they will be procuring the services of another attorney to represent them in this cause." The same motion requested that the court continue and reschedule the hearing set for January 7 "to give the said defendants' new attorney ample time to prepare for said hearing."
On January 13 the following motion was filed in court: "Comes now L.W. Johnson Associates, Inc., and moves to continue the trial of the above case and to allow Gene Hamby to be substituted as its attorney." The trial court denied the motion the same day. On January 17, T. Michael Putnam entered a notice of appearance and filed a motion for continuance, stating that the first attorney had withdrawn because it had become apparent in December that a conflict of interest had developed; that the second attorney had withdrawn his conditional appearance when his motion for continuance was denied; that he (Putnam) had first learned of the case on January 15; that the case was not ready for trial because little if any discovery had been conducted; and that he did not have adequate time to prepare for the trial "if the [case] is called for trial during the week of January 20, 1986."
Plaintiffs filed an objection to the motion for continuance on January 20. There is no ruling in the record on the motion for continuance, but defendants state that the court orally denied it, apparently on the day it was filed. Defendants' attorney filed, also on January 20, a notice of taking Foster's deposition. The deposition was taken on January 21 and the trial began on January 24.
The grant or denial of a continuance is within the sound discretion of the trial court. The law does not favor continuances, and the trial court's exercise of its discretion will not be reversed except for gross abuse. Dowdy v. GilbertEngineering Co., 372 So.2d 11 (Ala. 1979); State ex rel. Paynev. Empire Life Ins. Co. of America, 351 So.2d 538 (Ala. 1977), cert. denied, Ex parte Moody, 435 U.S. 969, 98 S.Ct. 1607,56 L.Ed.2d 60 (1978). See also Madison v. Weldon, 446 So.2d 21
(Ala. 1984); Mitchell v. Moore, 406 So.2d 347 (Ala. 1981).
The facts in Dowdy were very similar to those of this case. Dowdy's attorney realized three weeks before trial that he could not represent both Dowdy and Dowdy's co-defendant, but did not relinquish the case to Dowdy's new attorney until the evening before trial. The record indicated that the new attorney was familiar with the case as much as three weeks prior to the trial. The Court affirmed the denial of a continuance in Dowdy.
Here, defendants' new attorney entered his appearance a week before the trial and deposed Foster three days before the trial. He generally argues that this case is distinguishable from Dowdy because discovery had been conducted in that case, whereas virtually none had been conducted prior to his accepting this case. However, the only basis on which defendants' attorney argues that his case was hampered by the short time between his appearance and the trial is that he was not able to obtain discovery of "the extensive bills, invoices, and other documents that came to light at trial." No issue is made with respect to those bills, however, so this argument does not warrant a finding that the trial court abused its discretion.
On the contrary, nothing presented in regard to the motion for continuance shows that the trial court erred in declining to *Page 622 
delay the trial. Payment on the contract had been due on June 22, seven months before the trial, and Johnson Associates had never raised any substantial defense to Foster's and Rivers Construction's claims to be paid for work completed in May. After this suit and the mortgage foreclosure proceeding were filed, Johnson Associates and Johnson spent several months attempting to prevent the foreclosure. After their first attorney withdrew in early January, the trial court apparently continued the case from trial dockets on January 7 and 13 to give the defendants time to retain a new attorney. Their present attorney was consulted on January 15; he conferred with their first attorney and reviewed his files on January 16; he entered an appearance on January 17; he deposed Foster on January 21; and he tried the case on January 24 and 27. He makes no allegation that he was hampered in his presentation of the merits of defendants' case, and we see no sign in the record that he was. Under the circumstances, we cannot say that the trial court's denial of the motion for continuance was an abuse of discretion. Therefore, this issue, stated as number III above, presents nothing for reversal.
Issue number I involves the contentions that improper questions and remarks by plaintiffs' attorney unfairly prejudiced the jury against Johnson Associates and Johnson. This argument relates to two sets of facts: the attorney's questions to Johnson regarding payment of other contractors hired by Johnson Associates and the attorney's remark during closing argument that "A million dollars is nothing to this man," meaning Johnson.
The following exchanges during plaintiffs' examination of Johnson form the basis of the first argument:
 "Q. Was Allen [Foster] your only contractor who ever worked for you?
"A. No.
"Q. Who worked before him?
"A. We had Billy Earl King do some work over there.
". . . .
"Q. Was Mr. King's work good?
"A. Yes, it was.
"Q. Did you pay Mr. King?
"A. Yes, ma'am.
"Mr. Putnam: Your Honor, I object.
"The Court: Sustained.
"Q. Who was the contractor after Allen?
"A. I believe Nason Construction Company.
"Q. Did you have problems with Nason's work?
"Mr. Putnam: Your Honor, I object.
"The Court: Sustained.
 "Ms. Green: Your Honor, I would say that this fellow — he cheats everybody just as he cheated Allen.
 "Mr. Putnam: Your Honor, I object and ask the jury be instructed about the comments.
"The Court: Sustained."
A short time later in Johnson's testimony the following occurred:
 "Q. Isn't it a fact that you are being sued right now by that compressor —
 "Mr. Putnam: I object [to] getting into other matters.
"The Court: Sustained.
 "Q. Mr. Foster is not the only person you have said the work is not good [sic]?
 "Mr. Putnam: I object on the same ground, getting into matters not in issue in this case."
"The Court: Sustained."
Soon thereafter, the following exchange occurred:
 "Q. You have [had] wells flowing since June, haven't you?
"A. Yes.
". . . .
"Q. Have you paid any of your leaseholders —
"Mr. Putnam: I object, nothing to do with this case.
"Q. Did you intend to pay Allen Foster?
 "A. Well, certainly. I think it's evidenced by the fact that we spent hours going over the fact that his premium price was based on the note, the mortgage and he was going to get a premium price for it. *Page 623 
 "Q. As a matter of fact, you told him that if he finished in time he would get three percent or four percent of the drilling program, didn't you?
 "A. I don't — no, there was never any agreement to that.
"Q. You never made that statement?
 "A. No. There is no way to make that kind of agreement. It doesn't exist.
 "Q. Did you ever make a statement to your leaseholders that you would give them eight percent?
"Mr. Putnam: I object again.
"The Court: Sustained.
 "Q. Did you ever make a statement to anybody to give them a percentage?
 "Mr. Putnam: Your Honor, I object again, nothing to do with this case.
 "Ms. Green: It has to do with this case. Your Honor, he told my client if he finished in time he would give him four percent. He told John Beckett he would give him four percent. He told these leaseholders he would give them an eighth.
 "Mr. Putnam: On the continuing conduct of Ms. Green I move for a mistrial. She is constantly trying to prejudice the jury.
"The Court: Denied. Go ahead."
Johnson Associates and Johnson also raise the following exchange in their argument regarding misconduct of plaintiffs' attorney:
 "Q. You knew when you were talking with him and gave him that worthless piece of paper, you knew you weren't going to pay him, didn't you?
 "A. No. I had every intention of paying him. If his work had been proper and good, no doubt we would have paid him.
 "Q. Did you have every intention of paying the people that gave you that compressor, if their work had been proper?
"Mr. Putnam: I object.
 "The Court: Sustain the objection and instruct counsel not to make references to other transactions."
Finally, defendants cite as part of the alleged prejudicial conduct by plaintiffs' counsel a statement reflected thus in the record:
 "Q. You were going to put three gigantic compressors in there, weren't you?
 "A. There is five headed this way right now. We are going to put more than that on it.
 "Mr. Putnam: Your Honor, I don't know that the court reporter picked up the comment made by Ms. Green; but, again, I implore the Court to instruct counsel not to make comments about other matters that are not at issue in this case in the presence of the jury.
 "The Court: Sustained. I didn't hear it either; but, please refrain from that sort of tactic."
Plaintiffs' attorney responds on this issue that she was attempting in good faith to prove the plaintiffs' case "within the framework of the general rule [that] allows plaintiffs great latitude in the admissibility of collateral matters with respect to similar frauds and misrepresentations made by defendants," citing Dorcal, Inc. v. Xerox Corp., 398 So.2d 665
(Ala. 1981), and Winn-Dixie Montgomery, Inc. v. Henderson,395 So.2d 475 (Ala. 1981).
In Winn-Dixie v. Henderson, Henderson sued for fraudulent representations by a Winn-Dixie employee that he would be allowed to transfer to another Winn-Dixie store. This Court held that the trial court properly allowed another former Winn-Dixie employee to testify that his supervisor had also made misrepresentations concerning promised transfers. This Court stated:
 "[Previous] similar acts by different agents, both of whom act for the defendant, are admissible to show fraud, scheme, motive or intent. . . . Moreover, wide latitude is allowed with regard to testimony in fraud cases since often the perpetrator is the sole possessor of the actual knowledge of the fraud."
395 So.2d at 477 (citations omitted).
In Dorcal, supra, this Court affirmed the trial court's decision to sustain an objection to testimony about collateral facts because the plaintiff's offer of proof "did not refer to any specific comparisons proposed *Page 624 
to be proved through the witness nor was it otherwise specific enough to make its relevancy apparent to the trial court." 398 So.2d at 671.
We note also Roberson v. Ammons, 477 So.2d 957 (Ala. 1985), in which the Court affirmed the trial court's decision to admit into evidence a federal court injunction prohibiting the defendants from making sales or loans without complying with consumer credit laws. The Court stated: "Generally, evidence of past dealings of a party with nonparties is excluded as irrelevant; however, when intent of the party is at issue, that party's prior conduct and acts on other occasions which have a bearing upon that party's intent in a subsequent action are competent evidence." Id., at 962.
In this case, the trial court sustained all the defendants' objections in the exchanges that they claim the plaintiffs' attorney was using to attempt to prejudice the jury by introducing collateral matters. Under the rule stated in the three cases cited above, the plaintiffs' attorney's questions were at least a colorable attempt to prove the intent element of the fraud claim. The only ruling that was unfavorable to the defendants was the denial of their motion for mistrial. This came after most of the exchanges set out above, so the trial court had observed the alleged pattern of attempting to prejudice the jury when it ruled on the mistrial motion. "The granting of a mistrial is within the sound discretion of the trial [judge] because he is present to see the effect, if any, that the alleged improper statement had on the jury." RecordData International, Inc. v. Nichols, 381 So.2d 1, 6 (Ala. 1979). We see no abuse of that discretion in this instance.
The other alleged prejudicial misconduct by plaintiffs' attorney was her statement during closing argument, "A million dollars is nothing to this man," referring to Johnson. Defendants' attorney requested to approach the bench, and a conference was held outside the hearing of the jury. Defendants' attorney filed a motion in the trial court to supplement the record on appeal to reflect that, during this bench conference, (1) he objected to the statement because it was an improper and direct reference to the wealth of the parties; (2) he moved for a mistrial; and (3) the court overruled the objection and denied the motion. Plaintiffs made no objection to this motion or its rendition of the bench conference, so we shall accept it as adequate preservation of the objection and motion. Cf. Rule 10 (d)-(f), A.R.A.P.
Defendants cite numerous cases for the proposition that statements made during arguments solely to introduce a defendant's wealth before the jury are inadmissible and grounds for a mistrial, at least in the absence of strong curative instructions from the trial court: Otis Elevator Co. v.Stallworth, 474 So.2d 82 (Ala. 1985); Young v. Bryan,445 So.2d 234 (Ala. 1983); Estis Trucking Co. v. Hammond, 387 So.2d 768
(Ala. 1980); Allison v. Acton-Etheridge Coal Co., 289 Ala. 443,268 So.2d 725 (1972); Liberty National Life Ins. Co. v.Kendrick, 282 Ala. 227, 210 So.2d 701 (1968). We note also, on the same point, Ashbee v. Brock, 510 So.2d 214 (Ala. 1987).
With due regard to the strength of the prohibition against making references to an opponent's wealth, we note also the presumption in favor of the trial court's rulings on whether argument is so improper as to warrant a curative instruction or declaration of a mistrial:
 "[T]he control of the argument of counsel is largely within the discretion of the trial judge, who observes the demeanor of counsel and can determine whether a prejudicial atmosphere is created by such remarks. . . . Unless there is abuse of discretion by the trial court that results in substantial prejudice, this Court will not interfere with the trial court's ruling."
Yesterday's, Inc. v. Lamey, 492 So.2d 988, 989 (Ala. 1986) (citations omitted).
Here, we have only the isolated statement that "[a] million dollars is nothing to this man." Plaintiff's attorney argues that the statement "was a reference to defendants' callous indifference to the financial hardship they inflicted on plaintiffs." We cannot speculate on whether this may have been the true import of the statement, and *Page 625 
plaintiffs' argument, in the absence of supplementation of the record, cannot have any force in demonstrating that the argument was a reference to Johnson's callousness. The argument does, however, point out the merit of vesting the trial court with discretion in ruling on such matters. The court observed the demeanor of the attorneys, heard the remark in context, witnessed the effect upon the jury, and was able to make a better judgment than we as to whether the remark was improper argument and might have prejudiced the jury. Therefore, we decline to rule that the trial court abused its discretion in overruling the objection and denying the motion for mistrial.
Issue number II alleges that the jury's award of punitive damages was excessive. After this appeal was filed, but before the case was submitted for consideration on the merits, this Court remanded the case for the trial court to enter findings and conclusions in conformity with Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986). The trial court entered a short order essentially stating that the verdict was supported by the fact that the culpability of the defendants was great and by the need to prevent the defendant and others from engaging in similar conduct in the future. We think that the above-recited facts are sufficient to show that the jury could have believed from the evidence that the defendants engaged in a calculated scheme to obtain plaintiffs' materials and labor without having to pay for them; and such a finding would support the verdict rendered. There is no error here.
Issue number III was addressed above.
Issue number IV seems to depend on the point that only Rivers Construction, not Foster, was a party to the contract. The contract count was not submitted to the jury. The best we can make of the argument is that, because only Rivers Construction was a party to the contract, any misrepresentations made to Foster were made to him as president of his corporation, not to him individually, and thus that he had no claim for fraud. This obviously presents nothing of merit. Foster individually relied on Johnson's representations by performing personal services in fulfillment of the contract, and Johnson intended that he do so. Foster also introduced evidence that he lent substantial sums of money to Rivers Construction in furtherance of this project, and this was in accordance with Johnson's expectation that Rivers Construction would provide financing for the project. Defendants make no issue that Rivers Construction was not entitled to sue for fraud because it was a non-qualified foreign corporation. See, on this point, the cases cited in footnote one above. The trial court did not err in submitting both plaintiffs' fraud claims to the jury.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.
[1] Section 10-2A-247 (a) provides in pertinent part: "All contracts or agreements made or entered into in this state by foreign corporations which have not obtained a certificate of authority to transact business in this state shall be held void at the action of such foreign corporation." The trial court granted a directed verdict for the defendants on the contract claim, and no issue is made here as to the application of this statute. But cf. Shiloh Construction Co. v. MercuryConstruction Corp., 392 So.2d 809 (Ala. 1980), and Jones v.Americar, Inc., 283 Ala. 638, 219 So.2d 893 (1969), on the right of a foreign corporation to maintain a tort claim.
[2] The jury apparently took this sum into consideration in arriving at its verdict; the verdict read: "We, the jury, find for the plaintiff and assess its compensatory damages at three hundred thousand dollars minus one hundred thirty-five thousand, a hundred sixty-five thousand balance, and assess punitive damages at five hundred thousand dollars." Foster testified that defendants owed him $215,000, not including his labor. There was considerable evidence regarding the value of the work done over and above the original $115,000 contract and regarding other elements of compensatory damages. At any rate, defendants have not raised any issue regarding the amount of compensatory damages, as can be seen from the statement of issues beginning this opinion.