Mobile Dodge, Inc., appeals from the judgment of the trial court entered pursuant to a jury verdict of $125,000 in favor of the plaintiff, Danny Alford, in this action for fraud arising from the sale of a 1978 Chevrolet Corvette. We affirm.
The Corvette which was sold by Mobile Dodge to Alford had been rebuilt with parts from two automobiles, one bearing vehicle identification number 1Z87L8S414708 (hereinafter V.I.N. 4708), and the other bearing vehicle identification number 1Z87LS419392 (hereinafter V.I.N. 9392). The automobile bearing V.I.N. 4708 had been stolen in 1978 while in transit from Louisville, Kentucky. The automobile bearing V.I.N. 9392 had been wrecked in Texas in 1981. Most of the remaining material facts in the case are in dispute.
The following evidence was presented by the plaintiff, which the jury could have believed, and evidently did:
On September 30, 1982, Alford bought a 1978 Corvette, which appeared to be a "Silver Anniversary" model, from Mobile Dodge. He had been told by the salesman at Mobile Dodge that the automobile was in excellent condition and had never been wrecked. He was also told that the Corvette was eligible for a "Chrysler Used Vehicle Protection Plan" which would have protected him from loss if major repairs were to become necessary.
Twenty days after the purchase, Alford was given notice that the Corvette was not eligible for the Used Vehicle Protection Plan. Meanwhile, Alford had been having problems with the Corvette. He testified that the sun visor on the Corvette had fallen off; the power windows would not work; one of the pillar posts was out of line; the "air conditioner blew out hot and cold air at the same time"; the harmonic balancer had fallen off; and the transmission support had "busted," knocking both mufflers off.
Disturbed and dissatisfied with the service he had received from Mobile Dodge, Alford took the Corvette to Gulf Coast Corvettes, a repair shop specializing in Corvettes. The owner of that shop, Bob Gechijian, testified that when he inspected the Corvette, he found a clutch pedal hidden under the floor carpet. He testified this was an indication that the automobile, although it now had an automatic transmission, had once had a standard transmission. This fact was substantiated by the presence of a smaller brake pedal than would normally accompany an automatic transmission.
Gechijian further testified that the factory metal transmission lines had been cut and replaced with rubber hose. He stated that these rubber hose lines created a dangerous condition because transmission fluid is corrosive to rubber. Moreover, he discovered that although the Corvette appeared to be a "Silver Anniversary" 1978 Corvette, in fact, it was not; it had been repainted to resemble that particular Corvette model. Gechijian testified that it was his opinion that someone with knowledge of Corvettes would have noticed that the automobile had been repainted and would have realized that the small brake pedal was inconsistent with an automatic transmission. He testified that these facts indicated that the automobile had been wrecked and then rebuilt. Armed with that suspicion, he stated, a dealer should have put the automobile up on a rack. If they had done so, according to Gechijian, the dealer would have discovered extensive rust in the frame and noticed other damage to the frame.
Alford's problems with the Corvette were not limited to these mechanical difficulties. On September 30, 1982, the same day Alford bought the Corvette, the Alabama Department of Revenue sent a letter to John Reid, a criminal investigator with the Department of Public Safety — Alabama Bureau of Investigation (ABI), requesting that he check the vehicle identification numbers on this Corvette. When Reid went to Mobile Dodge to inspect the Corvette, Mobile Dodge informed him of the sale to Alford. Within thirty days of the time the request to investigate was made of him, Reid contacted Alford and told him *Page 868 
to bring the Corvette by a certain Chevron service station for an inspection.
Corvettes have vehicle identification numbers in four places: the engine, transmission, left door pillar post, and on the frame. Reid determined by looking at the engine, transmission, and pillar post numbers that they were all V.I.N. 9392. Since the service station rack was in use and it looked as if it would soon rain, Reid did not check the number on the frame at that time. However, when he inspected the frame number later, he determined that that number there was V.I.N. 4708. In his testimony at trial, Reid said that his investigation led him to the following conclusions: The Corvette that Alford had bought from Mobile Dodge was in fact made up of two different Corvettes. The frame and related parts belonged to a Corvette with V.I.N. 4708. The large amount of rust in that part of the automobile indicated that the Corvette with V.I.N. 4708 had been under water at one time. This fact would make the automobile a "salvage vehicle," and Reid reported that conclusion to the Department of Revenue. Reid also discovered that the Corvette with V.I.N. 4708 had been stolen during transit.
Reid testified that the engine, transmission, serial plate, and possibly the left door belonged to a Corvette with V.I.N. 9392. The record shows that the Corvette with V.I.N. 9392 had been wrecked in Texas on or before October 19, 1981, in a "relatively severe" front end collision. Alford introduced pictorial evidence of this wreck, to which Mobile Dodge objected.
Although V.I.N. 9392 was found only on the engine, transmission, and left door pillar post of the Corvette, Alford was given a bill of sale to a Corvette with that number.
The title history of the Corvette with V.I.N. 9392 is as follows: This automobile was owned by Robert Michael at the time it was wrecked in Texas on or before October 19, 1981. After the wreck, the Corvette was taken to a Houston, Texas, repair shop. The Corvette was never repaired; it was transferred to Houston Salvage Pool, a pool dealing in wrecked and "totalled" automobiles.
On December 8, 1981, the State of Texas issued a salvage certificate of title to Farmer's Insurance Group of Houston, Texas. This insurance company obtained title when it paid Robert Michael for his claim on the Corvette. Later that same month, Farmer's Insurance Group sold the Corvette to H H Motors. On July 4, 1982, H H Motors sold the Corvette to Frank W. Allison, who, on September 26, 1982, traded the Corvette to Mobile Dodge as a down payment on a new truck.
The history of the Corvette with V.I.N. 4708 is unknown between the time it was stolen and the time its vehicle identification number was found on the Corvette in question.
Bertha Dunlap, title and lien examiner of the Motor Vehicle Division, Alabama Department of Revenue, testified as follows:
Frank Allison filed an application for an Alabama certificate of title for the Corvette on August 16, 1982. The Department of Revenue received this document on August 20, 1982. On that same day, August 20, a salvage certificate of title on the Corvette with V.I.N. 9392 was received by the Department of Revenue. That salvage certificate of title indicated Frank Allison's ownership of the Corvette. All of these documents were sent to the salvage unit of the Motor Vehicle Division of the Department. From August 25, 1982, to November 2, 1982, when title was issued, the file on Corvette V.I.N. 9392 was in suspense in the salvage unit of the Motor Vehicle Division.
Charles Patton, the supervisor of the salvage unit, sent the request to John Reid to inspect the Corvette. This request was dated September 30, 1982. The request indicated that the Corvette was located at Mobile Dodge. The Department of Revenue would have known the location of the Corvette only by inquiry from Mobile Dodge. This inquiry was made before September 30, the date of the sale to Alford. Any such inquiry from Mobile Dodge would have been immediately transferred to the salvage unit. *Page 869 
Kenneth Shereck, sales manager at Mobile Dodge on September 30, 1982, testified as follows:
He had spent twenty years in the automobile business and was an expert on Corvettes. In his career, he had bought and sold between 500 and 600 Corvettes, had owned many Corvettes personally, and was familiar with Corvettes from model 1956 through the latest models. He was familiar with 1978 model Corvettes.
Part of Shereck's job was to approve used automobiles and to manage the "Used Car Department" of the dealership. When Allison brought the Corvette to Mobile Dodge, Shereck examined the Corvette in detail. He noticed the Corvette had been repainted and he admitted that this put him on notice that it could have been wrecked. He discovered paint overspray in various parts of the automobile. He wondered whether the Corvette had been under water at some time because the automobile had a musty smell. He found numerous other defects in the automobile.
Shereck recorded the results of his appraisal on an appraisal slip, on which he wrote "W" for "wholesale," to indicate that it was his recommendation that the Corvette not be sold to the public, but at auction.
Shereck told the owner of Mobile Dodge that he felt the Corvette should be sold at wholesale. However, the owner told Shereck to "clean up [the Corvette] and retail it." Four days later, the Corvette was sold to the plaintiff Alford.
Alford filed an action against Mobile Dodge, alleging various misrepresentations. At the end of all the evidence, Mobile Dodge moved for a directed verdict. This motion was denied. The jury returned a verdict in favor of Alford in the amount of $125,000. Mobile Dodge filed a motion for judgment notwithstanding the verdict, or in the alternative, for new trial and/or remittitur. This motion was also denied. Judgment was entered and this appeal followed.
Mobile Dodge presents four issues for our review:
 I. Whether there was sufficient evidence to support the verdict regarding the alleged misrepresentations by Mobile Dodge as to title;
 II. Whether the trial court erred when it admitted into evidence documents relating to the salvage title of the Corvette with V.I.N. 9392 and photographs of that Corvette in a wrecked condition;
 III. Whether the trial court erred in its statement to the jury regarding the law of punitive damages;
 IV. Whether the damages awarded by the jury were excessive and against the weight of the evidence.
 I
One of the counts which went to the jury alleged as follows:
 "At the time of the negotiations for the sale of the 1978 Chevrolet Corvette the Defendant represented to the Plaintiff that the Defendant had good title to the Corvette and could and would transfer good title to the Plaintiff. Said representations by the Defendant were willful misrepresentations of material facts under Section 6-5-103 Code of Alabama 1975
which were relied upon by the Plaintiff in purchasing the Corvette and fraudulent deceit upon the Plaintiff. The Plaintiff alleges that the Defendant at the time of the representations did not have good title to the Corvette."
Mobile Dodge contends that there was insufficient evidence to show that Mobile Dodge knew or should have known that it did not have good title to the Corvette. Since Mobile Dodge moved for a directed verdict as to this count at the end of all the evidence, specifically calling attention to the lack of evidence, and filed a motion for a judgment notwithstanding the verdict, or in the alternative for a new trial, if there is no evidence to support this count, the verdict must be set aside, even though there was sufficient evidence to support the other misrepresentation *Page 870 
counts. John Deere Industrial Equipment Co. v. Keller,431 So.2d 1155 (Ala. 1983).[1]
The scintilla rule is the standard of evidence rule which this Court must apply. The question is whether there is any evidence or logical inference which can be drawn therefrom to support the jury verdict as to the count alleging willful misrepresentation of good title. Allstate v. Alexander,484 So.2d 375 (Ala. 1985). It is our view that there is evidence in the record to support a finding that Mobile Dodge knew or should have known that it did not have good title to the Corvette, and that it misrepresented that it could transfer good title. The jury could have found the following from the evidence: Mobile Dodge inquired of the salvage unit of the Motor Vehicle Division of the Department of Revenue as to the state of title to the Corvette before the automobile was sold to Alford. It was routine for Mobile Dodge to make such inquiries whenever a trade-in was brought to its lot by one who had no title, certificate or who, like Frank Allison, was making application for title. Sherwood Gleason, finance manager for Mobile Dodge at the time of the sale of the Corvette to Alford, certified the title application filed by Alford. Gleason signed the following statement found on that application:
 "I hereby certify that the above described vehicle has been physically inspected by me and that the V.I.N. and descriptive data on this application are correct. . . ."
We cannot say the trial court was in error when it denied Mobile Dodge's motions for directed verdict and for J.N.O.V.
Mobile Dodge contends that even if the allegations that it misrepresented that it could transfer good title are true, Alford was not damaged because he received an Alabama certificate of title on the Corvette on February 2, 1983. However, this certificate of title was based on information obtained by John Reid during an initial investigation in which he checked only the three locations on the Corvette where V.I.N. 9392 was found and failed to check the frame number. On a subsequent inspection, he found that the number on the frame was different from the other three numbers.
It has been held that a certificate of title to an automobile is only prima facie evidence of ownership and can be contradicted by other evidence. City Car Sales, Inc. v.McAlpin, 380 So.2d 865 (Ala.Civ.App. 1979), cert. denied,380 So.2d 869 (Ala. 1980). Furthermore, Code 1975, § 32-8-49, provides that the Department of Revenue can suspend or revoke a certificate of title if it was fraudulently procured or erroneously issued. Therefore, Alford's title to the Corvette is in serious jeopardy, and thus he has been damaged by the fraudulent conduct of Mobile Dodge. Moreover, Mobile Dodge's contention in this regard is inconsistent with its contention in the second issue presented for review. In the second issue, it contends that the Corvette's true V.I.N. was 4708, which is not the vehicle identification number of the vehicle to which a certificate of title was issued to Alford, namely V.I.N. 9392. Likewise, V.I.N. 4708 is a stolen vehicle and Mobile Dodge could never transfer good title to a stolen vehicle. State FarmMutual Automobile Insurance Co. v. Wagnon, 53 Ala. App. 712,304 So.2d 216, (1974).
 II
Mobile Dodge next contends that the trial court erred when it admitted into evidence over objection documents relating to the salvage title of the Corvette with V.I.N. 9392 and photographs of that Corvette *Page 871 
in a wrecked condition. Mobile Dodge argues that the Corvette's true V.I.N. was 4708 and, therefore, that the above evidence was misleading and prejudicial.
Rulings as to the admissibility of evidence will not be disturbed on appeal in the absence of a gross abuse of discretion. Russellville Flower Craft, Inc. v. Searcy,452 So.2d 478 (Ala. 1984).
The photographs of the Corvette in its wrecked condition were relevant to show the damages sustained by Alford from the fraud. The salvage documents were relevant to the issues relating to title, and to the question of whether the Corvette should have been held out for sale to the public. The trial court did not abuse its discretion when it admitted this evidence.
 III
Mobile Dodge next asserts that the trial court erred in its statement to the jury regarding the law of punitive damages. The trial court charged the jury as follows:
 "In addition to actual or compensatory damages, the law authorizes a jury to award punitive damages in fraud and deceit actions if it is shown to the reasonable satisfaction of the jury by the evidence that the fraud or the deceit was malicious, oppressive or gross or a misrepresentation made with knowledge of its falseness or so recklessly done as to amount to the same thing and committed with the intent to injure and to defraud.
 "If you are reasonably satisfied from the evidence that the defendant was guilty of a fraud or deceit as charged by the plaintiff and that such fraud or deceit was malicious, oppressive or gross and made with the intent to injure and defraud the plaintiff and the plaintiff did suffer damage as a proximate result of such fraud or deceit, then in your discretion you may award the plaintiff punitive damages in addition to any actual damage you find from the evidence the plaintiff did suffer."
Mobile Dodge argues that punitive damages should be allowed only under "exceptional and extraordinary circumstances clearly indicating aggravated, malicious or spiteful conduct" (quoting from Chief Justice Torbert's dissenting opinion in Winn-DixieMontgomery, Inc. v. Henderson, 395 So.2d 475 (Ala. 1981)). If this were the standard for the imposition of punitive damages in Alabama, the trial court would not be in error, because its instructions included the phrase "malicious, oppressive or gross" in addition to the requirement of intent to deceive. However, the fact that the law requires only an intent to deceive or defraud for the imposition of punitive damages,American Honda Motor Co. v. Boyd, 475 So.2d 835 (Ala. 1985), does not place the trial court in error insofar as the defendant Mobile Dodge is concerned.
 IV
Last, Mobile Dodge contends that the damages awarded by the jury were excessive and against the weight of the evidence. It asks this Court to grant a remittitur.
This Court has held that a remittitur or a new trial should not be ordered on the grounds of excessiveness of the jury's verdict except in those cases where the Court can see that the verdict has been reached on account of bias, passion, prejudice, corruption, or other improper motive. Vest v. Gay,275 Ala. 286, 154 So.2d 297 (1963); Airheart v. Green, 267 Ala. 689, 104 So.2d 687 (1958). In short, a remittitur or a new trial should be ordered on the ground of excessiveness where there is an improperly functioning jury.
This Court will not disturb the trial court's ruling on the damages issue unless this Court finds the trial court's decision to be a "plain and palpable" error. Vest v. Gay,supra.
This Court has upheld verdicts with punitive damages awards in fraud and misrepresentation cases in excess of the award in the present case. National Security Fire Casualty Co. v.Bowen, 447 So.2d 133 (Ala. 1983) ($1,500,000); ShilohConstruction Co. v. Mercury Construction Corp., *Page 872 392 So.2d 809 (Ala. 1980) ($559,966.61); National StatesInsurance Co. v. Jones, 393 So.2d 1361 (Ala. 1980) ($500,000);Alabama Farm Bureau Mutual Casualty Insurance Co. v. Griffin, [MS. 84-452, January 17, 1986] ___ So.2d ___ (Ala. 1986) ($276,368) (Torbert C.J., and Adams and Houston, JJ., dissenting on the issue of remittitur).
We look first to the enormity of the wrong. Alford was sold an automobile consisting of parts from two separate automobiles. One of these automobiles had been stolen, thus placing Alford's ownership of the present automobile into question. The other automobile had been wrecked and salvaged in Texas. The present automobile is entrusted with rust, probably a result of its having been subjected to water damage. The extent of the true damage to the present automobile is unknown. What is known is that Alford, the passengers and guests in this Corvette, and the general public using the public streets and highways and the sidewalks abutting the same were subjected to a substantial risk of bodily harm and even death by the sale of the seriously defective vehicle by Mobile Dodge to Alford with representations that it was in excellent condition and had never been wrecked. See Treadwell Ford, Inc. v. Campbell,485 So.2d 312 (Ala. 1986).
Although this was a general verdict and we do not know what portion of the award would relate to compensatory damages, due to the enormity of the wrong in this case, we would affirm an award of $125,000 solely as punitive damages.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and BEATTY, JJ., concur.
[1] "[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by the evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count."
Aspinwall v. Gowens, 405 So.2d 134, 138 (Ala. 1981).