John Buchanan, one of the two defendants, appeals from a judgment based on a *Page 135 
jury verdict in favor of the plaintiff, Ron Collier, against Buchanan and his co-defendant Jack Newsome. Newsome does not appeal. The verdict was for $100,000 but the trial court remitted it to $50,000. Collier, in response, attacks the remittitur. We affirm in part, reverse in part, and remand.
The issues presented on appeal are whether the plaintiff suffered damages; whether the evidence was sufficient to prove the existence of an agency relationship between Buchanan and Newsome; whether the trial court erred when it refused to force Collier to elect as between defendants Buchanan and Newsome; and whether the trial court properly remitted the jury's verdict.
This case arises out of the purchase of a Chevrolet Corvette automobile by Collier. The evidence would support a finding of the following facts: In 1985, Collier and his brother travelled from Sylacauga to Birmingham to look at and possibly to purchase a Corvette that had been advertised by Southern Auto Sales, which was owned by Newsome. The Corvette Collier was interested in had been sold, but Newsome told Collier that a friend of his, Buchanan, had a Corvette convertible that he might want to sell. Newsome's son went to Buchanan's place of business and brought the car back to Newsome's lot. Newsome told Collier that the 3,062 miles on the odometer represented the actual miles the car had been driven. Newsome told Collier that the car was a 1980 model, even though in 1980 Chevrolet did not manufacture a Corvette convertible. Newsome's explanation for this inconsistency was that the car had been "customized" subsequent to its manufacture. Newsome negotiated on behalf of Buchanan, and the three men finally agreed on a price of $11,200. Collier noticed that the oil gauge and a headlight were not functioning. Collier arranged financing of the purchase price through Peoples Bank and Trust Company of Sylacauga. He then paid for the car by giving Newsome a personal check for $11,200 made out to Newsome. Collier testified that Newsome told him that he would be receiving a "rebuilt title" because the car had been customized and the car was not accurately reflected on the title.
Collier then drove the car to Buchanan's garage. Because he felt that the engine did not perform according to Chevrolet standards on the drive to the garage. Collier said he asked Buchanan if the engine was an "L-82" engine and that Buchanan replied that it was.
Collier and his brother then drove the car back to Sylacauga. Several weeks later, Collier received a letter from Newsome informing him that there were some problems with the title. Collier called Newsome, who told him to call Buchanan. Buchanan told Collier to bring the car to his garage so that he could remove the vehicle identification number (VIN). Several weeks later, Collier took the car to Buchanan, who removed the VIN plate and installed a dealer's transit tag on the car. In order to obtain a certificate of title, Buchanan submitted several documents, which bore the signature of Collier as signed by Buchanan, to the Alabama State Department of Revenue.
In June 1986, Lt. Winston Sanders of the Department of Revenue contacted Collier and asked to inspect the Corvette. That same month Lt. Sanders travelled to Sylacauga and inspected the car. Sanders then asked Collier to sign a statement on the application for title indicating that the information on the application was true. Collier refused to sign the application.
The evidence indicated that the car Collier purchased had been built from two wrecked Corvettes, one of them a 1980 Corvette and the other a "1976" Corvette that had itself been built from wrecked 1975 and 1976 Corvettes. Buchanan argues that the car was worth between $6,500 and $7,500 at the time of trial. Collier argues that it was worthless because one could not get a certificate of title for it. Buchanan argues that the bill of sale contained an "as is" clause and that Newsome, who conducted the negotiations, was aware that the car had been rebuilt from wrecked cars. *Page 136 
 WAS THE PLAINTIFF DAMAGED?
Collier admitted that the rebuilt car was worth $8,000, but only if he could get a certificate of title for it, which he never received. Buchanan argues that the Department of Revenue was prepared to issue a certificate of title, had Collier signed the application for title presented to him by Lt. Sanders.
We have held that even in cases where a certificate of title is issued, the title is merely evidence of ownership and may be contradicted by a showing of fraud. Mobile Dodge, Inc. v.Alford, 487 So.2d 866, 870 (Ala. 1986). "Code 1975, § 32-8-49, provides that the Department of Revenue can suspend or revoke a certificate of title if it was fraudulently procured or erroneously issued." Id. Had Collier signed the statement on the application for title asserting that the information contained on the title was true, specifically that the car was a 1980 Corvette, that application would have been fraudulent, because Collier was aware at that point that the car was an amalgam of wrecked Corvettes. Thus, any certificate of title that he might have obtained would have been revocable by the Department of Revenue.
Where a plaintiff has suffered damage due to the fraudulent conduct of a defendant, the measure of damages is the amount required to place the plaintiff in the position he would have been in had the representations by the defendant been true.Morris v. Westbay Auto Imports, Inc., 512 So.2d 1373 (Ala. 1987). Had the defendants' representations that the Corvette was a 1980 model been true and a valid certificate of title respecting the car had subsequently been issued, the value of the car would have been, by all accounts, in excess of $6,000. Because a certificate of title respecting the car could not be acquired, the car had no resale value. Therefore, the plaintiff was damaged.
 DID AN AGENCY RELATIONSHIP EXIST?
Newsome testified that he had sold several other wrecked cars on behalf of Buchanan prior to selling the one he sold Collier. "The existence and the scope of a principal-agent relationship is normally a question of fact to be determined by the jury."Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 304-05
(Ala. 1986). There was sufficient evidence for a jury to find that a principal-agent relationship existed and, as a result, we need not address Buchanan's contentions that Newsome, and not Buchanan, made the false representations. "Apparent authority of an agent arises from the acts of the principal, either by omission or commission, and such authority is implied where the principal passively permits the agent to have the authority to act on his behalf." Id., at 304.
 SHOULD THE TRIAL COURT HAVE REQUIRED THE PLAINTIFF TO MAKE AN ELECTION?
In Alabama, damages are not apportioned among joint tort-feasors. Joint tort-feasors are jointly and severally liable for the entire amount of damage incurred. Yancey v.Farmer, 472 So.2d 990, 992 (Ala. 1985). Thus, Collier may recover from either Newsome or Buchanan or from both.
 DID THE TRIAL COURT IMPROPERLY REMIT THE JURY'S VERDICT?
A jury's verdict is presumed by this Court to be correct.Cooper Chevrolet, Inc. v. Chambers, 529 So.2d 913, 914 (Ala. 1988). However, the trial court may order a remittitur of a jury's verdict where it is clear that the verdict was the result of "bias, passion, prejudice, corruption, or other improper motives." Aspinwall v. Gowens, 405 So.2d 134, 137
(Ala. 1981). The trial court may not reduce the jury's verdict solely on the grounds that it thinks the victim is being overcompensated. Hammond v. City of Gadsden, 493 So.2d 1374,1379 (Ala. 1986). In order for the trial court to remit a jury verdict, it must "state for the record the factors considered in either granting or denying a motion for new trial based upon the alleged excessiveness or inadequacy of a jury verdict." Id.
In its order, the trial court stated that "the verdict rendered in this case by the *Page 137 
jury shocked the court and it is considered by the court that the verdict and judgment heretofore rendered in this cause in favor of the plaintiff is excessive. . . ." The trial court's order does not meet the requirements of Hammond, because the reasons for reducing the jury verdict were not specified. Therefore, we reverse the judgment insofar as it was based on the remittitur and remand this cause for a hearing in accordance with our opinion in Hammond. On all other issues, we affirm.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.