[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1071 
Defendants Liberty National Life Insurance Company ("Liberty National") and its former agent Keith Mahone appeal from a $145,000 judgment entered by the Montgomery County Circuit Court in favor of plaintiff Betty Sanders. We affirm.
Sanders sued Liberty National and Mahone for fraud; deceit; fraudulent suppression; fraudulent misrepresentation; negligent hiring, training, and supervision; and bad faith refusal to investigate. Sanders dismissed her bad faith refusal to investigate claim. The trial court conducted a jury trial.
At the close of Sanders's evidence and at the close of all the evidence, Liberty National and Mahone moved for a judgment as a matter of law, which the trial court denied. The jury returned a verdict of $10,000 in compensatory damages and of $135,000 in punitive damages in favor of Sanders and against Liberty National and *Page 1072 
Mahone. The trial court entered a judgment on the verdict.
Liberty National and Mahone renewed their motion for a judgment as a matter of law, or in the alternative, for a new trial, or in the alternative, for a remittitur and reconsideration of the taxing of attorney's fees against them as a discovery sanction for tardily taking of the deposition of one Russell Hurst. The trial court denied the motion. Liberty National and Mahone appealed.
On appeal, Liberty National and Mahone raise 11 issues: (1) whether Sanders presented substantial evidence to support the $10,000 compensatory damage award; (2) whether Sanders presented clear and convincing evidence to support the $135,000 punitive damage award; (3) whether the trial court erred in charging the jury on spoliation of evidence; (4) whether the trial court erred in charging the jury on the elements of intentional fraud and in including intentional or willful fraud in its charges on punitive damages; (5) whether the trial court erred in refusing to give Liberty National and Mahone's requested jury instruction No. 19 on fraud; (6) whether the trial court erred in refusing to give Liberty National and Mahone's requested jury instruction No. 21 on "lost opportunity"; (7) whether the trial court improperly admitted prejudicial evidence on an irrelevant and immaterial issue; (8) whether Sanders's counsel made improper arguments prejudicial to Liberty National and Mahone; (9) whether the $10,000 compensatory damage award is excessive; (10) whether the $135,000 punitive damage award is excessive; and (11) whether the trial court erred in denying Liberty National and Mahone's motion to reconsider the taxing of the attorney fee as a discovery sanction.
"In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party. . . ."Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala. 1999). See also Cobbv. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala. 1992), and Mason DixonLines, Inc. v. Byrd, 601 So.2d 68 (Ala. 1992). A presumption of correctness attaches to a jury verdict, "if the verdict passes the `sufficiency test' presented by motions for directed verdict and a JNOV."S W Properties, Inc. v. American Motorists Ins. Co., 668 So.2d 529, 534
(Ala. 1995). (Rule 50(a), Ala.R.Civ.P., now designates a motion for a directed verdict as a motion for a judgment as a matter of law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.) This presumption is strengthened by a trial court's denial of a motion for a new trial. Christiansen v. Hall, 567 So.2d 1338
(Ala. 1990). "This Court will not, on a sufficiency of the evidence basis, reverse a judgment based on a jury verdict unless the evidence, when viewed in a light most favorable to the [verdict winner], shows that the verdict was `plainly and palpably wrong and unjust.'" S WProperties, 668 So.2d at 534 (quoting Christiansen, 567 So.2d at 1341). "Whether to grant or deny a motion for new trial rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court's ruling constituted an abuse of that discretion." Colbert County-Northwest AlabamaHealthcare Authority v. Nix, 678 So.2d 719, 722 (Ala. 1995). "Without a showing of such an abuse, the trial court's ruling must be affirmed."Id.
 A. Compensatory Damages
Liberty National and Mahone argue that Sanders did not present any evidence of actual damage resulting from Mahone's alleged fraudulent misrepresentation and *Page 1073 
suppression. Because Sanders is the jury-verdict winner, we must view the evidence in the light most favorable to Sanders. S W Properties,supra; Cater v. Henderson, 598 So.2d 1350 (Ala. 1992);Williams v. Allstate Ins. Co., 591 So.2d 38 (Ala. 1991). Thus, the issue before us is whether the evidence viewed in the light most favorable to Sanders supports the jury's award of $10,000 in compensatory damages.
Sanders first purchased an insurance policy from Liberty National in 1971. Over the ensuing years, Sanders purchased various policies from Liberty National. In 1986, after Sanders was laid off from her nursing position, Sanders allowed her Liberty National policies to lapse because she could not afford to pay the premiums. In 1993, Sanders decided that she needed life insurance to insure her own life and the life of her son David Ogle, a disabled adult. Ogle, an overweight cigarette-smoking schizophrenic, lived at a nearby hospital, but came home frequently. Needing life insurance and recalling her past experience with Liberty National, Sanders telephoned the local Liberty National office and asked to speak with a salesman about purchasing a life insurance policy.
In February 1993, Liberty National sent insurance agents Tim McLain and Keith Mahone to Sanders's mobile home to discuss her purchase of life insurance. At that time Sanders purchased a Liberty National life insurance policy insuring her own life. The policy had a face amount of $10,000 and had a monthly premium amount of $54.22. Additionally, Sanders asked Mahone about purchasing a homeowner's insurance policy. The next day, Mahone returned to Sanders's mobile home with the paperwork for a fire insurance policy insuring Sanders's mobile home. Approximately two or three weeks later, Sanders telephoned Mahone and asked him about purchasing a life insurance policy insuring the life of her son, Ogle.
On March 23, 1993, Mahone met with Sanders and Ogle at Sanders's mobile home. Sanders told Mahone that she wanted to purchase a $10,000 policy like the one she had purchased insuring her own life to insure Ogle's life. She told Mahone that she wanted the policy in case anything happened to Ogle. Sanders and Ogle informed Mahone that Ogle was a schizophrenic and a smoker. Mahone completed the application for the life insurance policy.
Sanders testified that Mahone told her the policy insuring Ogle would be the same as the one she purchased insuring her own life, that Mahone told her that she would receive $10,000 if anything happened to her son, and that Mahone told her that the policy would be effective when she paid the first premium. Sanders delivered the first month's premium to Mahone. Mahone tendered the application and premium to Liberty National, which rejected Sanders's application because Mahone quoted the wrong premium amount. Liberty National cancelled that policy and returned the premium to Sanders.
In April 1993, Sanders asked Mahone to complete another application for a life insurance policy to insure Ogle. Mahone did not explain why Liberty National cancelled the first policy on Ogle. Sanders again brought Ogle home to meet with Mahone, and again told Mahone that Ogle was a schizophrenic and a smoker. She told Mahone that she wanted the policy because she would not have the money to bury Ogle unless she had insurance. Mahone asked Ogle the questions on the application for life insurance. One of the questions was whether the applicant suffered from a "brain disease." Ogle responded, "Yes." On April 19, 1993, Mahone *Page 1074 
completed, and Ogle signed, the application for insurance on Ogle's life. The next day, April 20, 1993, Sanders paid the monthly premium of $192 to Mahone. Sanders testified that on April 20, 1993, Mahone
 "assured [her that] the policy was effective when I gave him the money. Mr. Russell H. Hurst was present when I gave the money to Mr. Mahone and was aware of his accepting the money and declaring the policy was effective upon receipt of the money. Mr. Mahone did not give me a receipt for the money, but took it, with Mr. Hurst present assuring me the policy was effective immediately."
On April 23, 1993, Liberty National issued Sanders a policy insuring the life of Ogle, but Sanders never received the policy. On April 24, 1993, Ogle died of natural causes. Later that day, Sanders telephoned Mahone and left a message on his answering machine for Mahone to call her.
On the day of Ogle's funeral, Mahone went to Sanders's mobile home. Mahone had Sanders complete a "death claim," which requested a "lump sum" payment of the insurance proceeds. Sanders sent the "death claim" to Liberty National. Mahone told Sanders that she would receive a $10,000 check in the mail from Liberty National. Thereafter, Liberty National mailed Sanders a check in the amount of $193.30, comprising the one premium Sanders had paid plus 10% interest on that premium. Sanders did not accept the check and did obtain counsel, who sent a Mahone letter inquiring when Sanders could expect payment of the full $10,000. Mahone gave the letter to Liberty National. Liberty National sent Sanders's counsel a letter stating it had paid Sanders the full amount owed under the policy.
Sanders testified that, because Liberty National refused to pay her $10,000, the face amount of the policy, she had to take a second job to pay for her son's funeral. She testified that she was upset because she did not have the money to bury her son. She testified further that she was upset also because she did not believe Liberty National would pay any claims regarding her fire insurance policy or her life insurance policy on her own life. Because Sanders did not trust Liberty National, she dropped those two Liberty National policies.
In defense of themselves, Liberty National and Mahone offer their explanation of the policy and the transaction. The application stated that, if the applicant answered "yes" to the question whether he suffered from a "brain disease," as Ogle answered, then he was eligible only for a "Modified Benefit Limited Payment Life Plan (ALX)." Moreover, Ogle's weight disqualified him for the type of policy that insured the plaintiff's own life and allowed him only a "`Modified Benefit Limited Payment Life Plan' (ALX)." The application did not state, but the "ALX policy" which Sanders never received did state, that the policy would pay the full face-value benefit of $10,000 during the first three years of the policy only if the applicant died from an accidental cause, and that the policy would not pay the full face-value benefit of $10,000 if the applicant died of natural causes before the expiration of those first three years, but would pay only the sum of premiums then paid plus ten percent for death from natural causes during that initial three-year waiting period.
Sanders testified that Mahone never told her about the three-year waiting period. She testified that he "assured [her] the policy was effective when I gave him the money" and that, after she paid the premium, he assured her "the policy was effective immediately." While Sanders's testimony to this effect is disputed, the *Page 1075 
jury resolved the conflict in favor of Sanders. She testified further that, had she known of the three-year waiting period, she would not have bought the policy.
 A.1. The Difference Between Represented Value and True Value
Liberty National and Mahone specifically argue that Sanders failed to prove any actual damage inasmuch as Sanders testified that she would not have purchased the policy if she had known of the three-year waiting period. A fraud victim's proof of reliance, however, hardly negates the victim's proof of damages.
This Court has held:
 "[T]here is [a] well-settled rule pertaining to the measure of damages resulting from fraudulent conduct or representations, to the effect that such damages will be fixed by an amount which would place the defrauded person in the position he would occupy if the representations had been true."
Fogleman v. National Surety Co., 222 Ala. 265, 268, 132 So. 317 (1931) (emphasis added). See also Buchanan v. Collier, 555 So.2d 134, 136
(Ala. 1989), John Hancock Variable Life Ins. Co. v. Pierce, 530 So.2d 719,725-26 (Ala. 1987), and Morris v. Westbay Auto Imports, Inc.,512 So.2d 1373, 1374 (Ala. 1987). See also Hartselle Real Estate Ins.Co. v. Atkins, 426 So.2d 451 (Ala.Civ.App. 1983) (citing Boriss v.Edwards, 262 Ala. 172, 77 So.2d 909 (1954), and Martin v. Honeycutt,341 So.2d 171 (Ala.Civ.App. 1976)) (the measure of damages for a fraudulent misrepresentation of a thing purchased is the difference in the value of the thing as represented and the value of the thing as actually received).
The evidence viewed in the light most favorable to Sanders establishes that, although Mahone represented the policy to be worth $10,000.00 for the death of Ogle regardless of when or how he died, in reality the policy, as it would have been received by Sanders, was worth only the paid premium plus ten percent. The evidence is undisputed that Liberty National did not tender $10,000 to Sanders and that Sanders did not accept the $193.30 tendered to her by Liberty National.
The law of fraud measures Sanders's actual damages as the almost-$10,000 difference between the value of the policy as represented and the value in reality. Therefore, the evidence supported an award for that difference plus the $193.30 tendered and refused. Indeed, the jury did award Sanders compensatory damages in precisely that sum, $10,000, which placed Sanders in the monetary position she would have occupied if Mahone's representations about the life insurance policy had been true. Sanders's statement that she would not have purchased the policy if she had known of the three-year waiting period proved the reliance elements of her fraud and suppression claims and did not negate her proof of actual damage. See Buchanan, supra. Sanders's proof of mental anguish is further support for the $10,000 compensatory award, already entirely supported by the economic proof.
 A.2. Lost Opportunity
Although Liberty National and Mahone assert that Sanders did not prove "lost opportunity" to support compensatory damages and that therefore Sanders did not prove any damage to support a compensatory award, a fraud victim need not prove all types of damage which could result from the fraud, so long as she does prove damage according to some legally recognized theory, as Sanders did. Moreover, while Sanders did not rely on "lost opportunity" as her theory of recovery of compensatory damages, the record does contain evidence that the defendants' misrepresentations and suppressions cost *Page 1076 
Sanders an opportunity to obtain at least $2,500 in immediate coverage for her son.
The president of Liberty National, Anthony L. McWhorter, testified that both Liberty National and United American Insurance Company are owned by Torchmark. He stated that Liberty National agents are licensed to sell United American life insurance policies. In 1993, United American had a "stair-step" life insurance policy comparable to Liberty National's ALX policy. The United American "stair-step" policy paid $2,500 for a death from natural causes in the first year and paid $5,000 for a death from natural causes in the second year.
McWhorter testified that, although the State of Alabama licenses Liberty National agents to sell United American life insurance policies, Liberty National does not permit its agents to sell United American life insurance policies. He testified also that Liberty National studies the "products" of other insurance companies in order for Liberty National to design its own "products." McWhorter testified that he would not be surprised to learn that other companies sold a better "product," without a three-year waiting period, than Liberty National's ALX policy.
Thus, the evidence tends to prove an opportunity for Sanders to have purchased a policy with substantial coverage without the three-year waiting period from another insurance company, if Mahone had been truthful about the waiting period. This evidence of lost opportunity, together with Sanders's evidence of mental anguish supports the jury's award of $10,000 in compensatory damages on theories of damages independent of her primary theory that she was entitled to recover the value of the policy as represented.
 A.3. Excessiveness (Vel Non) of Compensatory Damages
Additionally, Liberty National and Mahone contend that the $10,000 compensatory damages award is excessive. Because, as explained, the evidence supports the entire quantum of compensatory damages, the award of $10,000 is not excessive. Fogleman, supra.
 B. Intentional Fraud
Liberty National and Mahone state their intentional fraud issues as follows: "There is no substantial evidence to support punitive damages," and "the trial court committed prejudicial and reversible error in charging the jury on elements of intentional fraud, and by including intentional or willful fraud in its charges on punitive damages." The defendants do not argue these issues precisely the way they are stated. First, Liberty National and Mahone assert that Sanders dismissed her claim of intentional or willful misrepresentation and that "[t]herefore the only claims which were submitted to the jury were for reckless fraud and fraudulent suppression." In an inconsistent position, Liberty National and Mahone argue that the trial court erred in charging the jury on intentional misrepresentation and in including intentional or willful misrepresentation in its charges on punitive damages.
The record of the charge conference before the oral charge and of the oral charge itself proves the contrary. At the charge conference, Liberty National and Mahone did not object to either Sanders's requested jury charge no. 8, Alabama Pattern Jury Instruction: Civil (APJI) 18.04, or Sanders's requested jury charge no. 16, APJI 18.09. The trial court gave Sanders's requested jury charge no. 8, APJI 18.04, in part, in these words:
 "If you are reasonably satisfied from the evidence that the defendant deceived the plaintiff by the reckless representation of a material fact that's true, which he did not know to be false, to induce *Page 1077 
the plaintiff to act, and the plaintiff did act thereon to his injury, the defendants are guilty of deceit which is legal fraud.
 "I further charge you that the defendants' knowledge of the falsehood is an essential element of the deceit. A fraudulent or reckless representation of the facts as true which the defendants did not know to be false, if intended to deceive the plaintiff, is the equivalent to knowledge of the falsehood."
Telling a known falsehood with the intent to deceive is intentional, or willful, fraud if the plaintiff justifiably relies[1] on the falsehood and acts on the falsehood to the plaintiff's detriment, APJI 18.04. The colloquy among counsel and the trial judge about the possibility of Sanders's withdrawing a willful misrepresentation charge refers to Sanders's requested charge no. 6, not no. 8, quoted in pertinent part above.
Likewise, the trial judge gave Sanders's requested jury charge no. 16, APJI 18.09, in these words:
 "In addition to actual damages, ladies and gentlemen, the law authorized the jury to award punitive or exemplary damages in fraud actions if it is shown by clear and convincing evidence that the fraud was an intentional misrepresentation, deceit, or a concealment of a material fact the concealing party had a duty to disclose which was gross, oppressive, or malicious and committed with the intention on the part of one of the defendants and thereby depriving a person or entity of property or legal rights or otherwise causing injury.
 "Clear and convincing evidence is evidence that when weighed with evidence in opposition will produce in the minds of a jury a firm conviction as to each essential element of a claim and a high probability as to the correctness of a conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or a substantial weight of the evidence, but less than beyond a reasonable doubt.
 "If you are reasonably satisfied that the defendants have been shown by clear and convincing evidence to be guilty of an intentional misrepresentation, deceit, or a concealment of a material fact that the defendants had a duty to disclose which was gross, oppressive, malicious and committed with the intention on the part of the defendants of thereby depriving the plaintiff of property or legal rights or otherwise causing injury, and that the plaintiff did suffer injury or damage as a proximate result of such fraud, then in your discretion you may award the plaintiff punitive damages in addition to actual damages as you find from the evidence she did suffer."
Moreover, at the charge conference, Liberty National and Mahone specifically and expressly insisted that the trial judge give their requested jury charge no. 11, APJI 11.03, on punitive damages, and the trial judge agreed. (R. 427-28.) The trial judge gave APJI 11.03, as requested by Liberty National and Mahone, virtually verbatim, in these words:
 "The purpose of awarding these punitive or exemplary damages is to allow money recovery to the plaintiff by way of punishment to the defendants and for the added purpose of protecting the public by deterring these defendants *Page 1078 
and others from doing such wrongs in the future.
 "The imposition of punitive damages is entirely discretionary with the jury. Should you award punitive damages, in fixing the amount, you must take into consideration the character and degree of the wrong as shown by the evidence and the necessity for preventing similar wrongs in the future.
 "For the plaintiff to be entitled to recover punitive damages, the plaintiff must prove by clear and convincing evidence that the defendants consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the plaintiff.
 "Clear and convincing evidence means evidence that when weighed against evidence in opposition will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.
 "Oppression means subjecting the person to cruel and unjust hardship and conscious disregard of that person's right.
 "Fraud means an intentional misrepresentation, deceit, or concealment of a material fact that the concealing party had a duty to disclose which was gross, oppressive, or malicious and committed with the intention on the part of the defendants and thereby depriving a person or entity of property or legal rights or otherwise causing injury.
 "Wantonness means conduct which is carried on with a reckless or conscious disregard for the rights or safety of others.
 "Malice means the intentional doing of a wrongful act without just cause or excuse either with the intent to injure the person or property of another person or under such circumstances as the law will imply an evil intent."
(Emphasis added.) Thus, the trial court did submit the theories of intentional, or willful, misrepresentation, as well as intentional, or willful, suppression, to the jury, and Liberty National and Mahone themselves demanded and received one of the punitive damage charges containing the same theories and explaining the recoverability of punitive damages pursuant to the theories. Moreover, Liberty National's and Mahone's not interposing any objection to these two charges for Sanders and demanding the charge on punitive damages constitutes their waiver of any objection to the consideration of these theories and the consideration of punitive damages by the jury.
 C. Punitive Damages
Liberty National and Mahone argue, first, that none of their alleged acts warranted an award of punitive damages. They argue, second, that the punitive damage award of $135,000 is excessive.
 C.1. Liability for Punitive Damages
Punitive damages must be supported by clear and convincing evidence "that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." §6-11-20(a), Ala. Code 1975. Section 6-11-20(b) defines the terms "fraud," "malice," "wantonness," and "oppression":
 "(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury. *Page 1079 
 "(2) Malice. The intentional doing of a wrongful act without just cause or excuse, either:
 "a. With an intent to injure the person or property of another person or entity, or
 "b. Under such circumstances that the law will imply an evil intent.
 "(3) Wantonness. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
". . . .
 "(5) Oppression. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."
"`Gross' is defined as inexcusable, flagrant, or shameful." Talent TreePersonnel Services, Inc. v. Fleenor, 703 So.2d 917, 924 (Ala. 1997). Additionally § 6-11-27(a), Ala. Code 1975, provides:
 "A principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either: (i) knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master, except where the plaintiff knowingly participated with the agent, servant, or employee to commit fraud or wrongful conduct with full knowledge of the import of his act."
The acts of Mahone in this case benefited Liberty National. Mahone's misrepresentations and suppressions of material fact caused Sanders to purchase an insurance policy that she otherwise would not have purchased. Mahone intentionally sold Sanders a life insurance policy which differed from the type of policy she had for herself and specifically requested for her son. It required a substantially greater monthly premium with minimal benefits. Liberty National was the recipient of the premium actually paid and was the prospective recipient of the future premiums anticipated. Moreover, Liberty National tried to minimize its obligation on the policy by insisting that Sanders was due only the return of her premium plus 10%. Liberty National's effort to save the money it owed according to Mahone's misrepresentations and suppressions constituted a ratification of his fraud. Additionally, although Mahone was a new agent, inexperienced in the sale of life insurance policies, Liberty National did not monitor Mahone's sales or his sales techniques. Liberty National monitored only Mahone's payment of premium monies to Liberty National. Therefore, Sanders's proof meets the criteria for the imposition of punitive damages not only upon the agent Mahone but also upon the principal Liberty National.
 C.2. Excessiveness (Vel Non) of Punitive Damages
Next, Liberty National and Mahone contend that the $135,000 punitive damage award is excessive. Pursuant to a Hammond hearing, the trial court concluded that the award is not excessive. While the trial judge entered a thorough and persuasive order to such effect and addressed all of the applicable factors in the order, and while the record does contain evidence which, viewed in the light most favorable to the verdict winner, supports *Page 1080 
an inference of aggravating circumstances, including spoliation discussed at length below, nonetheless, performing our appellate duty to review the award for excessiveness, we conclude that the punitive damage award should be remitted from $135,000 to $60,000. While the compensatory award, which is not excessive, is only $10,000, a $60,000 punitive award would be appropriate because of the aggravating circumstances and because of the complexity and difficulty of the litigation.
 D. Fair Trial Issues D.1. Spoliation
Liberty National and Mahone contend that the trial court erred in instructing the jury on spoliation of evidence. They argue that Sanders did not produce any evidence of spoliation to support the instruction. However, the record does contain evidence, which, viewed in the light most favorable to the verdict winner, tends to prove that Douglas Harris, a Liberty National officer and witness, wrote and produced false notes purporting to memorialize an exculpatory telephone discussion between him and Liberty National agent Mahone, a telephone discussion which, in fact, never occurred; that Harris likewise presented false testimony to the occurrence and substance of that fabricated discussion; and that Liberty National and Mahone introduced Harris's notes and testimony at trial with knowledge that both were false.
The evidence of spoliation is contained in an affidavit sworn by Mahone; Liberty National's answers, prepared, sworn, and executed by Liberty National executive vice-president William R. Dean, to interrogatories propounded by Sanders; the deposition testimony of Harris, Liberty National's policy benefits coordinator; the notes written by Harris, produced by him at his deposition, and introduced by Liberty National and Mahone at trial; Mahone's testimony at trial; and Harris's testimony at trial. In his affidavit Mahone swore that he "was never consulted or questioned by anyone with Liberty National Life in regard to [Sanders's] claim."
The evidence of record, viewed in the light most favorable to the verdict winner, supports an inference that, after Liberty National's Mr. Dean searched the claim file, found nothing about any 1993 telephone conversation between Mahone and Harris, and answered Sanders's interrogatories accordingly on October 7, 1996, Harris himself, in preparation for his October 31, 1996, deposition, wrote false notes purporting to memorialize a July 21, 1993, telephone conversation between him and Mahone wherein Mahone said he had properly and timely explained the waiting period and limited benefits to Sanders, and further supports an inference that Harris then produced the false notes and presented false testimony to the same effect at the deposition itself. The evidence likewise supports the inference that both Liberty National and Mahone knew of the falsity of Harris's notes and his testimony when they called Harris as their first witness and introduced both his falsified notes and his false testimony before the jury. Such actions by Harris in his capacity as a Liberty National official, by Liberty National itself, and by Mahone would constitute spoliation.
APJI 15.13, given by the trial judge, predicates any adverse inference on the fact-finder's being reasonably satisfied from the evidence that the defendants committed spoliation. Viewing the evidence in the light most favorable to the jury verdict winner, Sanders, Sanders presented sufficient evidence to support the trial court's giving this instruction and allowing the jury to determine whether that evidence also supported a reasonable *Page 1081 
inference of the defendants' "guilt, culpability, or awareness" of their wrongdoing. See Alabama Power Co. v. Murray,751 So.2d 494 (1999).
 D.2. Refusal of Jury Charges
Next, Liberty National and Mahone argue that the trial court erred in refusing their requested jury instructions no. 19 and no. 21. The record on appeal does not contain Liberty National and Mahone's requested jury instructions nos. 19 and 21. Because the issues raised by Liberty National and Mahone are not presented by the record before us, we cannot conclude that the trial court erred in not giving these requested instructions. See Nelson v. Johnson, 594 So.2d 1228 (Ala. 1992).
 D.3. Evidentiary Rulings
Liberty National and Mahone contend that the trial court erred in allowing, over their objections, Sanders to introduce evidence concerning the collection of and accounting for premiums on Sanders's fire insurance policy and on her life insurance policy on her own life. They complain that this evidence prejudiced them so much that the error requires a new trial. The defect in the defendants' contention, however, is that Sanders did not succeed in introducing the evidence challenged by the defendants' objections.
"Evidence which is not relevant is not admissible." Rule 402, Ala. R. Evid. The Advisory Committee's Notes to Rule 401, Ala. R. Evid., state:
 "Relevancy remains a question over which the trial court has wide discretion. Eason v. Comfort, 561 So.2d 1068 (Ala. 1990); Roberson v. Ammons, 477 So.2d 957 (Ala. 1985); Ott v. Fox, 362 So.2d 836
(Ala. 1985) (observing that the trial judge has great discretion concerning the relevancy of evidence). That discretion is not unbridled. Ham v. Hood, 340 So.2d 763 (Ala. 1976). However, the trial court's ruling on relevancy will not be reversed unless it is plain that error was committed. Harper v. Baptist Medical Center-Princeton, 341 So.2d 133 (Ala. 1975). Indeed, the trial court's ruling on relevancy will not be disturbed on appeal unless discretion has been abused. Ryan v. Acuff, 435 So.2d 1244 (Ala. 1983)."
In this case, Sanders attempted to introduce evidence about cash receipts evidencing the collection of premiums by Mahone from Sanders. When Liberty National and Mahone objected to Sanders's question on the collection of premiums, the trial court overruled the objection. The witness, however, then asked for the question to be repeated, the court reporter read the question back, and Sanders's attorney stated that the question was too long and that he would start over with a new question. Sanders's next attempts to introduce the evidence about the collection of premiums occurred in the following exchange:
 "Q. Mr. McWhorter, do you understand this case, that Mr. Mahone took from Ms. Sanders when he sold her a second policy, her fire insurance, some hundred eight dollars on the fire insurance where he only turned into the company thirty-eight dollars and change, according to the application that the company produced for us in the case?
 "[Defendants' counsel]: Your Honor, that's misquoting the evidence in this case, and it is a matter not even pled.
 "THE COURT: Ladies and gentlemen, remember what these lawyers say is not evidence. It comes from the witness stand and from the documents.
"You can answer the question, if you know.
"Q. Do you understand that happened in this case? *Page 1082 
"A. No. sir.
"Q. Has anybody bothered to tell you?
"A. No, sir.
 "Q. Assume that it did. What does your company do to prevent something like that from happening; that is, the agents writing on the back of a business card or maybe not even writing on anything and keeping one and turning in less money? In other words, the company gets what the company is supposed to get. Is that all the company cares about?
 "[Defendants' counsel]: Your Honor, we object. We are far afield from the issues in this case.
"[Sanders's counsel]: I'll withdraw the question."
As the trial court instructed the jury, counsel's questions have no evidentiary force. Although the questions asked by Sanders's counsel sought evidence irrelevant to the issues, the witness did not answer the first objectionable question and gave negative answers to the second and third objectionable questions, this third being unchallenged by any objection, and Sanders withdrew the fourth and last objectionable question. Because Sanders did not succeed in introducing any evidence regarding the premiums for the policies not at issue, the rulings of the trial court did not prejudice Liberty National or Mahone.
Later in the trial, testimony regarding the collection of premiums for Sanders's fire insurance policy and the life insurance policy on her own life was introduced into evidence. Liberty National and Mahone, however, are the parties who introduced that evidence through their own witness, Harris. Once Liberty National and Mahone opened the door with that evidence, Sanders was entitled to cross-examine the witness about his testimony regarding the collection of premiums. Crowne Investments,Inc. v. Reid, 740 So.2d 400, 408 (Ala. 1999), and Brabner v. Canton,611 So.2d 1016, 1018 (Ala. 1992) We find no prejudicial error as claimed in this issue.
 D.4. Arguments of Counsel
Liberty National and Mahone contend that Sanders's counsel made improper arguments twice during his closing argument, but they admit that they did not seek a curative instruction or a mistrial.
 "Counsel can state or comment on all proper inferences from the evidence and draw conclusions based on the evidence. Calloway v. Lemley, 382 So.2d 540 (Ala. 1980). The standard of review by this Court on claims of improper argument is that we will not reverse unless substantial prejudice has resulted, and there is a presumption in favor of the trial court's ruling. Central of Georgia Railway Co. [v. Phillips, 286 Ala. 365, 240 So.2d 118 (1970)]."
Seaboard Coast Line R.R. v. Moore, 479 So.2d 1131, 1136 (Ala. 1985). Seealso Lance v. Ramanauskas, 731 So.2d 1204 (Ala. 1999). "Each case must be decided in view of the unique circumstances involved and the atmosphere created in the trial. Obviously, the trial court is in a better position than this Court to observe these circumstances. See General FinanceCorp. v. Smith, 505 So.2d 1045 (Ala. 1987)." Walker v. AsbestosAbatement Servs., Inc., 639 So.2d 513, 515 (Ala. 1994). Consequently, the trial court's ruling on these matters carries a presumption of correctness. Id. Moreover, "where a party objects to improper argument and the trial court sustains the objection, in order to later appeal on the basis of the improper argument it is necessary that the party request a curative instruction from the trial court." Walker, 639 So.2d at 515. *Page 1083 
The first challenged argument was:
 "There are two charges here in the case. It is real simple, so when Judge Reese gives you the law, you can listen to what I am saying right now.
 "One is fraud. Fraud is simple. Did Mr. Mahone tell Ms. Sanders before she gave him her money, no after she got the policy? All of this is smoke. What is at issue, because if it wasn't smoke and there was no issue for you to decide, Judge Reese would have thrown it out, and we wouldn't be here.
 "[Defendants' counsel]: You Honor, we object. It is improper argument.
"THE COURT: Let's move on."[2]
While counsel should not argue the rulings of the trial judge to the jury, counsel's argument did not cause the ineradicable prejudice addressed by Bennett v. Brewer, 682 So.2d 448 (Ala. 1996), and the cases discussed therein, where counsel referred during closing argument to the opposing parties' wealth. Any prejudicial effect of this argument by Sanders's counsel could have been cured by a curative instruction by the trial court. The failure of Liberty National and Mahone to request a curative instruction waived any error.
The next challenged argument by Sanders's counsel was:
 "Compensatory damages are damages that make a person whole as if nothing ever happened. That's the way I know to tell it. In this case we are talking about the ten thousand dollars, the money she was told she was going to get when she bought it. Some of you may go back and say, `Well, gosh, the policy says this.' What the policy says has nothing to do with this. If we were here on the policy, the Judge would have already decided this as a matter of law.
 "[Defendants' counsel]: Your Honor, we object. He knows that's improper argument.
"THE COURT: Sustained. Move on."
Inasmuch as the trial court sustained Liberty National and Mahone's objection and they did not request a curative instruction, Liberty National and Mahone "indicate[d their] satisfaction with the ruling: that party cannot later complain of the trial court's failure to do what it was not asked to do." Walker, 639 So.2d at 515 (citation omitted).
 E. Discovery Sanction
Last, Liberty National and Mahone contend that the trial court erred in denying their motion to reconsider the taxing of an attorney fee as a discovery sanction. However, they fail to cite any authority supporting their argument. Rule 28(a)(5), Ala.R.App.P., requires "that `[t]he argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to theauthorities, statutes and parts of the record relied on.' (Emphasis added.)" McLemore v. Fleming, 604 So.2d 353 (Ala. 1992). Therefore, we will not address whether the trial court erred in denying Liberty National and Mahone's motion to reconsider the taxation of an attorney fee as a discovery sanction.
 F. Conclusion
The judgment of the trial court is affirmed on the condition that the plaintiff *Page 1084 
accept a remittitur of the punitive damages award from $135,000 to $60,000 and that the plaintiff file with this Court an acceptance of the remittitur within 21 days of the date of our certificate of judgment, or, in the absence of such acceptance of such remittitur, then the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.*
HOOPER, C.J., and MADDOX, COOK, LYONS, and ENGLAND, JJ., concur.
BROWN, J., concurs in the result.
HOUSTON, J., concurs in part and dissents in part.
SEE, J., dissents in part and dissents from the judgment.
* Note from the reporter of decisions: The Supreme Court's docket sheets indicates that on December 18, 2000, the appellee filed an acceptance of the remittitur.
[1] This case was filed while this Court was applying the Hickox v.Stover, 551 So.2d 259 (Ala. 1989), standard of justifiable reliance essential to a fraud action, before Foremost Ins. Co. v. Parham,693 So.2d 409 (Ala. 1997), readopted the reasonable reliance standard. The defendants do not challenge the plaintiff's proof of reliance in this case.
[2] Because this rebuff by the trial court, in reality and substance, if not in form, overrules the defendants' objection, we treat the rebuff as an adverse ruling. See Hill v. State, 699 So.2d 974 (Ala.Crim.App. 1997), and Greer v. State, 475 So.2d 885 (Ala.Crim.App. 1985). But seeStone v. City of Huntsville, 656 So.2d 404 (Ala.Crim.App. 1994),Davenport v. State, 653 So.2d 1006 (Ala.Crim.App. 1994), and Hammond v.State, 502 So.2d 843 (Ala.Crim.App. 1986).